# United States Court of Appeals

*for the*

# Federal Circuit

SANDISK CORPORATION,

*Plaintiff-Appellee,*

– v. –

ROUND ROCK RESEARCH LLC,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
IN CASE NO. 3:11-CV-5243, JUDGE RICHARD SEEBORG

## NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLANT
## ROUND ROCK RESEARCH LLC

JON T. HOHENTHANER
RICHARD M. COWELL
DESMARAIS LLP
230 Park Avenue
New York, New York 10169
(212) 351-3400

*Attorneys for Defendant-Appellant*

October 3, 2014

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 26.1, 28(a)(1), and 47.4, counsel for

Defendant-Appellant Round Rock Research LLC certifies the following:

1.  The full name of every party or amicus represented by me is: Round Rock Research LLC

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A

4.  The names of all law firms and the partners or associates that appeared for the party  or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    <u>Desmarais LLP</u>   <u>Black & Hamill LLP</u>
    Jon T. Hohenthaner  Bradford J. Black
    Andrew G. Heinz   Andrew G. Hamill
    John C. Spaccarotella
    Richard M. Cowell
    Tamir Packin
    Ameet A. Modi
    Edward B. Terchunian
    Elizabeth S. Kimmel

Dated: October 3, 2014   /s/ Jon T. Hohenthaner
           Jon T. Hohenthaner

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iv

TABLE OF ABBREVIATIONS ....................................................................... vii

STATEMENT OF RELATED CASES ............................................................. viii

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT
    TO THE ISSUES ...........................................................................................3

I.     Background Of The Dispute............................................................................3

II.    Round Rock Accused Two Different Components Of SanDisk's Flash
       Memory Products Of Infringing The '791 And '053 Patents—Flash
       Memory Chips And Controller Chips. ...........................................................4

III.   SanDisk Asserted A Patent Exhaustion Defense Based Upon Its
       Purchase Of Flash Memory Chips From An Alleged Licensee In
       Japan. ............................................................................................................6

IV.   The District Court Concluded That SanDisk's Purchase Of Flash
       Memory Chips In Japan Exhausts Round Rock's United States Patent
       Rights In Both The Flash Memory Chips And SanDisk's Own
       Controller Chips............................................................................................8

SUMMARY OF ARGUMENT .............................................................................9

STANDARD OF REVIEW ................................................................................11

ARGUMENT ....................................................................................................12

I.     The District Court Erred In Concluding That Foreign Sales Exhaust
       United States Patent Rights. .........................................................................12

       A.     The District Court Failed To Follow This Court's Precedent
             That Foreign Sales Can *Never* Exhaust United States Patent
             Rights............................................................................................12

B.    The District Court's Attempt To Distinguish This Court's Precedent On The Grounds That SanDisk Purchased Flash Memory Chips In Japan From A "Worldwide" Licensee Is Incorrect..............................................................................14

1.    This Court Has Held That Even If A Patentee Or Licensee Has The Right To Sell Products Under The Patents Of Multiple Countries, Foreign Sales Cannot Exhaust United States Patent Rights Because Those Sales Are Not Made Under A United States Patent. ..........................14

2.    The Patentee Here Was Never Compensated Under The United States Patents-In-Suit For The Infringing SanDisk Products..................................................................17

3.    The *Kirtsaeng* Supreme Court Copyright Decision Did Not Overrule Or Otherwise Change The Law That Foreign Sales Can Never Exhaust United States Patent Rights. ...................................................................22

II.    Even If Foreign Sales Could Exhaust United States Patent Rights, The District Court Erred In Concluding That SanDisk Proved Patent Exhaustion. ...............................................................................24

A.    The District Court Misinterpreted The Micron-Toshiba License Agreement In Concluding That SanDisk Purchased Components Of The Accused Products From A Licensee. ................24

B.    Even If The Foreign Sales Of *Flash Memory Chips* To SanDisk Exhausted Round Rock's United States Patent Rights In Those Flash Memory Chips, Those Sales Cannot Exhaust Round Rock's Patent Rights In SanDisk's *Controller Chips*.........................29

1.    SanDisk Incorporates Round Rock's Patented Circuitry In Two Different Components Of The Accused Products—The Flash Memory Chips Purchased From The Alleged Licensee And The Controller Chips Designed By SanDisk. .............................................30

2.    Purchasing Patented Flash Memory Chips From An Alleged Licensee Does Not Grant SanDisk A License To

Incorporate Round Rock's Patented Technology Into Its
Own Controller Chips. ................................................................32

3.    The District Court Addressed Only The Flash Memory
Chip Based Infringement And Improperly Ignored The
Controller Chip Based Infringement........................................33

III.    The District Court Erred In Denying Summary Judgment Of
Infringement Of Claim 14 Of The '791 Patent. ............................................38

CONCLUSION .......................................................................................................39

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 6, 31, and 38 describes a confidential
SanDisk product feature described in SanDisk's non-public documents. The
material omitted on pages 18, 20, 25–28, and 33 describes terms of a confidential
license agreement between Micron and Toshiba. This material is deemed
confidential information pursuant to the Modified Stipulated Protective Order
entered by the district court on December 18, 2012, and was filed under seal in the
district court by Order dated July 3, 2014.

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................. 39

*Boesch v. Graff,*
  133 U.S. 697 (1890) ................................................................. 13

*Bowman v. Monsanto Co.,*
  133 S.Ct. 1761 (2013) ............................................................. 32

*Brain Life, LLC v. Elekta Inc.,*
  746 F.3d 1045 (Fed. Cir. 2014) ............................................... 11

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
  469 F.3d 1005 (Fed. Cir. 2006) ............................................... 24

*Fuji Photo Film Co. v. Int'l Trade Comm'n,*
  474 F.3d 1281 (Fed. Cir. 2007) ............................................... 22

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
  249 F. Supp. 2d 434 (D.N.J. 2003), *aff'd,* 394 F.3d 1368 (Fed. Cir.
  2005) ........................................................... 15, 16, 20, 21

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
  394 F.3d 1368 (Fed. Cir. 2005) ................................... passim

*Fujifilm Corp. v. Benun,*
  605 F.3d 1366 (Fed. Cir. 2010) ............................................... 17

*Imation Corp. v. Koninklijke Philips Electronics N.V.,*
  586 F.3d 980 (Fed. Cir. 2009) ................................................. 27

*In re U.S. Fin. Sec. Litig.,*
  729 F.2d 628 (9th Cir. 1984) ................................................... 25

*Int'l Rectifier Corp. v. Samsung Elecs. Co.,*
  361 F.3d 1355 (Fed. Cir. 2004) ............................................... 23

*Intel Corp. v. ULSI Sys Tech., Inc.,*
  995 F.2d 1566 (Fed. Cir. 1993) ............................................... 18

iv

*Jackson v. East Bay Hosp.*,
    246 F.3d 1248 (9th Cir. 2001) ..........................................................26

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
    264 F.3d 1094 (Fed. Cir. 2001) ............................................... passim

*Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*,
    973 F.2d 688 (9th Cir. 1992) ..................................................... 11, 38

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S.Ct. 1351 (2013)..................................................... 9, 22, 23, 24

*Leever v. Carson City*,
    360 F.3d 1014 (9th Cir. 2004) ..........................................................11

*London v. Carson Pirie Scott & Co.*,
    946 F.2d 1534 (Fed. Cir. 1991) ........................................................14

*Ninestar Tech. Co. v. Int'l Trade Comm'n*,
    667 F.3d 1373 (Fed. Cir. 2012), *cert. denied*, 133 S.Ct. 1656
    (2013) ........................................................................... 13, 14, 16, 17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013) ........................................................19

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008)......................................................... 16, 18, 32, 38

*U.S. v. Penn-Olin Chem. Co.*,
    378 U.S. 158 (1964)...........................................................................26

*United States v. Univis Lens Co.*,
    316 U.S. 241 (1942)...........................................................................38

*Univ. of W. Va. Bd. of Trs. v. VanVoorhies*,
    278 F.3d 1288 (Fed. Cir. 2002) ........................................................14

## Statutes

17 U.S.C. § 109(a) (2008)................................................................ 22, 24

28 U.S.C. § 1295(a)(1)...........................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1338(a) ..............................................................................1

28 U.S.C. § 2201 ...................................................................................1

28 U.S.C. § 2202 ...................................................................................1

Cal. Civ. Code § 1641 ..................................................................... 25, 28

## Rules

Fed. R. Civ. P. 56(a)....................................................................... 11, 38

# TABLE OF ABBREVIATIONS

*Parties*

| | |
|---|---|
| Round Rock | Round Rock Research LLC |
| SanDisk | SanDisk Corporation |

*Patents-in-Suit*

| | |
|---|---|
| '791 patent | U.S. Patent No. 6,570,791 |
| '053 patent | U.S. Patent No. 6,845,053 |

*Defined Terms*

| | |
|---|---|
| A___ | Joint Appendix page(s) |
| court or district court | United States District Court for the Northern District of California, Honorable Richard Seeborg presiding |
| Micron | Micron Technology, Inc. |
| Micron-Toshiba joint ventures | Flash Partners, Ltd., Flash Alliance, Ltd., and Flash Forward, Ltd. |
| Toshiba | Toshiba Corporation |

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the lower court was previously before this or any other appellate court. This appeal may directly affect co-pending litigation captioned *Round Rock Research LLC v. SanDisk Corporation*, Civil Action No. 1:12-cv-00569-SLR, before the United States District Court for the District of Delaware. Round Rock and its counsel are unaware of any other related cases currently pending before this Court or any other court that will directly affect or be affected by this Court's decision.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action for patent infringement under 28 U.S.C. §§ 1331, 1338(a), and 2201–02. On June 13, 2014, the district court entered orders granting summary judgment of non-infringement and denying summary judgment of infringement of the '791 patent and the '053 patent. On July 3, 2014, the district court entered final judgment in favor of SanDisk. Round Rock timely filed a notice of appeal on July 23, 2014. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in granting summary judgment of no infringement for patent exhaustion and in denying summary judgment of no patent exhaustion with respect to products sold by an alleged licensee *outside the United States*, in contravention of this Court's holdings in the *Jazz Photo* line of cases where "this court expressly limited first sales under the exhaustion doctrine to those occurring *within the United States*." *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005) (emphasis added).

2.     Whether the district court misinterpreted the Toshiba-Micron license agreement in concluding that later created Toshiba-SanDisk joint ventures are licensed to practice the inventions of the '053 and '791 patents.

3.     Whether the district court erred in applying patent exhaustion to infringing circuitry in one product component (controller chips) that SanDisk does not purchase from an alleged licensee simply because SanDisk purchases a different component that also includes infringing circuitry (flash memory chips) from an alleged licensee.

4.     Whether the district court erred in denying summary judgment of infringement of the '791 patent where SanDisk's only defense to infringement was patent exhaustion based upon foreign sales.

## STATEMENT OF THE CASE SETTING
## OUT THE FACTS RELEVANT TO THE ISSUES

### I.    Background Of The Dispute.

Round Rock is a technology investigation and patent licensing company that owns thousands of patents and patent applications acquired from Micron Technology, Inc. in 2009, spanning many different technical fields, ranging from semiconductor components and manufacturing processes to consumer products and systems. (A2450 at ¶¶ 5–6; A453–83.) In August 2011, Round Rock approached SanDisk to initiate licensing negotiations concerning SanDisk's unauthorized use of Round Rock's patented technology in its "flash" memory products. (A2451 at ¶ 8.) SanDisk designs and sells a wide range of such flash memory products, such as removable flash memory cards for digital cameras, camcorders, and mobile phones, embedded flash memory for mobile phones, tablets, and other portable devices, and portable USB flash drives. (A139 at ¶ 2; A522.)

SanDisk responded to Round Rock's request to engage in licensing negotiations by bringing a declaratory judgment action against Round Rock in the U.S. District Court for the Northern District of California on October 27, 2011, alleging non-infringement and/or invalidity of a number of Round Rock patents. (A54.) Through an amended complaint, SanDisk alleged that it did not require a license for use of two of Round Rock's patents—the '791 and '053 patents—on the

grounds of patent exhaustion.[1] (A138–54 at A147 (¶ 71); A153 (¶ 114).) Round

Rock asserted counterclaims for infringement of both these patents. (A155–90 at

A184–85 (¶¶ 207–17); A187–89 (¶¶ 229–39).)

## II.    Round Rock Accused Two Different Components Of SanDisk's Flash Memory Products Of Infringing The '791 And '053 Patents—Flash Memory Chips And Controller Chips.

The '791 and '053 patents are directed towards different aspects of flash

memory devices. In particular, the '791 patent is directed towards a flash memory

device with a DDRAM (double data rate dynamic random access memory)

interface that enables faster operation by providing output data and receiving input

data on both the rising and falling edges of a clock signal. (A118 at Abstract; A124

at col. 1:40–67.) The '053 patent is directed towards a flash memory device that

may be set to either a low power or high power mode of operation for use in

different applications. For example, a battery powered device would benefit from

the low power mode, whereas a line powered device would benefit more from the

high power mode that enables faster operation. (A128 at Abstract; A134 at

col. 1:21–48.)

Round Rock accused a number of SanDisk flash memory products of

infringing claims 1, 3, 4, and 14 of the '791 patent and claim 24 of the '053 patent

---

[1] During the course of the action, the parties dismissed their claims and counterclaims relating to all other patents asserted in the action.

based upon circuity in two different product components: (i) controller chips; and (ii) flash memory chips. SanDisk's flash memory products combine these two components (among other things) to create a single flash memory device, such as illustrated in the following representative block diagram—the controller chip is highlighted in green and the flash memory chip is highlighted in yellow:



(A1123 (emphasis added); A2121; A2155; *see also* A532–91 (identifying the controller chips and flash memory chips in various SanDisk flash memory products); A1084–105 (same); A1177–246 (same).)

Round Rock asserted separate infringement claims based upon both these components, as summarized in the tables below: (i) Round Rock identified infringement based upon circuitry primarily in the controller chip components (the "controller chip based infringement"); and (ii) Round Rock also identified infringement based upon circuitry primarily in the flash memory chip components (the "flash memory chip based infringement").

*Controller Chip Based Infringement:*

| Patent | Accused Products | Claim Charts |
|--------|------------------|-------------|
| '791 patent | SanDisk's iNAND products that comply with eMMC 4.41 or later and have "DDR" mode and SD products with "DDR50" mode. | A2153–82; *see also* A1944–66. |
| '053 patent | SanDisk's iNAND products that comply with eMMC 4.41 or later. | A2119–40; *see also* A1981–89. |

*Flash Memory Chip Based Infringement:*

| Patent | Accused Products | Claim Charts |
|--------|------------------|-------------|
| '791 patent | SanDisk's memory chips that implement Toggle mode or HSI mode. | A1543–70; *see also* A1967–80. |
| '053 patent | SanDisk's memory chips that implement ███████████. | A2141–52; *see also* A1990–95. |

## III.   SanDisk Asserted A Patent Exhaustion Defense Based Upon Its Purchase Of Flash Memory Chips From An Alleged Licensee In Japan.

SanDisk asserted a patent exhaustion defense based upon its purchase of the flash memory chip components from an alleged licensee in Japan. (A266–68; A272; A1639–40.) SanDisk did ***not*** assert patent exhaustion based upon the controller chip components or any alleged purchase within the United States. (A247–77; A1627–58.)

**CONFIDENTIAL MATERIAL OMITTED**

The facts underlying SanDisk's patent exhaustion defense were not disputed: (i) Micron and Toshiba entered a license agreement effective August 4, 1997, granting Toshiba and its "Subsidiaries" (as defined in the agreement) a license to Micron's patents in all countries of the world, including the '791 and '053 patents-in-suit (A443–51); and (ii) SanDisk purchases the flash memory chip components of the accused products in Japan from three Toshiba-SanDisk joint ventures created between 2004 and 2011—Flash Partners, Ltd., Flash Alliance, Ltd., and Flash Forward, Ltd. (A257–58 at 5:18–6:10; A523; A527; A529–30; A533 at ¶ 3; *see also* A607–712 (Flash Partners, Ltd. agreements); A713–807 (Flash Alliance, Ltd. agreements); A808–63 (Flash Forward, Ltd. agreements).)

But the parties disputed three legal issues surrounding SanDisk's patent exhaustion defense: (i) whether United States patent exhaustion applies to products purchased from an alleged licensee in Japan (A222–23; A256–63; A870–76; A1638–50; A1895–903; A2192–97); (ii) whether the Toshiba-SanDisk joint ventures are licensed under the Micron-Toshiba license agreement (A1638–44; A1903–05; A2197–98); and (iii) whether SanDisk's purchase of flash memory chips from an alleged licensee exhausts Round Rock's United States patent rights in SanDisk's own controller chips (A1650–51; A1905–07; A2198–200).

**IV.** **The District Court Concluded That SanDisk's Purchase Of Flash Memory Chips In Japan Exhausts Round Rock's United States Patent Rights In Both The Flash Memory Chips And SanDisk's Own Controller Chips.**

The parties filed several summary judgment motions with the district court relating to SanDisk's patent exhaustion defense and SanDisk's infringement of the '791 and '053 patents, among other things: (i) on February 27, 2013, Round Rock moved for summary judgment on SanDisk's patent exhaustion defense (A213–27); (ii) on March 13, 2014, Round Rock moved for summary judgment of infringement of claim 14 of the '791 patent and claim 24 of the '053 patent (A907–32); and (iii) on March 13, 2014, SanDisk moved for summary judgment of no infringement of the '791 patent and the '053 patent on the grounds of patent exhaustion (A1627–58).

The district court resolved all three legal issues in favor of SanDisk and thus granted SanDisk's motion and denied Round Rock's motions (A23–38), thereby disposing of all remaining claims and counterclaims between the parties (A39–43). The court entered final judgment in favor of SanDisk on July 3, 2014. (A44.)

## SUMMARY OF ARGUMENT

1.    The district court erred in granting summary judgment of no infringement for patent exhaustion and in denying summary judgment of no patent exhaustion based upon SanDisk's purchase of product components from an alleged licensee in Japan. This Court has held that such foreign sales can ***never*** occur under a United States patent and has expressly limited the exhaustion doctrine to sales occurring ***within*** the United States. (§ I.A.)

2.    The district court's attempt to distinguish this Court's precedent and apply the exhaustion doctrine to sales occurring ***outside*** the United States is incorrect for several reasons. (§ I.B.) First, this Court has already rejected the district court's reasoning that a different rule should apply to foreign sales made pursuant to a "worldwide" license. (§ I.B.1.) Second, the patentee here was never compensated under the United States patents-in-suit for the infringing SanDisk products, so there is no policy reason for expanding the scope of patent exhaustion to foreign sales. (§ I.B.2.) Third, the *Kirtsaeng* Supreme Court copyright decision did not purport to overrule or otherwise change the law that foreign sales can never exhaust United States patent rights. (§ I.B.3.)

3.    Even if the law of patent exhaustion changed so that foreign sales could exhaust United States patent rights, the district court's grant of summary judgment of no infringement for patent exhaustion and denial of summary

judgment of no patent exhaustion is erroneous for additional reasons. First, the district court misinterpreted the Micron-Toshiba license agreement in concluding that the Toshiba-SanDisk joint ventures are licensees. (§ II.A.) Second, even if the Toshiba-SanDisk joint venture sales of flash memory chips in Japan could exhaust Round Rock's United States patent rights in those memory chips, those sales cannot exhaust Round Rock's patent rights in SanDisk's controller chips. (§ II.B.)

4.     The district court also erred in denying summary judgment of infringement of claim 14 of the '791 patent because SanDisk's only defense to infringement was patent exhaustion based upon foreign sales, which is wrong as a matter of law. (§ III.)

## STANDARD OF REVIEW

The Court reviews the grant or denial of summary judgment under the law of the regional circuit. *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1052 (Fed. Cir. 2014). The Ninth Circuit reviews the grant or denial of summary judgment *de novo*. *Id.* (citing *Leever v. Carson City*, 360 F.3d 1014, 1017 (9th Cir. 2004)). Further, it is appropriate to review a denial of summary judgment where "it is accompanied by a final order disposing of all issues before the district court and where the record has been sufficiently developed to support meaningful review of the denied motion." *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992). In reviewing the grant or denial of summary judgment, the Court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Leever*, 360 F.3d at 1017; *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

## ARGUMENT

### I.    The District Court Erred In Concluding That Foreign Sales Exhaust United States Patent Rights.

SanDisk never paid Round Rock or the previous patent holder anything to practice the inventions of the '791 and '053 patents. Yet the district court ruled that SanDisk is free to incorporate Round Rock's patented technology into its flash memory products and import and sell those products in the United States simply because SanDisk purchased certain components of those products in Japan from a joint venture subsidiary of a licensee to the patents-in-suit. The district court's ruling is contrary to law and should be reversed.

#### A.    The District Court Failed To Follow This Court's Precedent That Foreign Sales Can *Never* Exhaust United States Patent Rights.

"The unrestricted sale of a patented article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold." *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1105 (Fed. Cir. 2001). "Thus when a patented device has been lawfully sold in the United States, subsequent purchasers inherit the same immunity under the doctrine of patent exhaustion." *Id*.

The district court's conclusion that ***foreign*** sales of flash memory products by Toshiba joint venture subsidiaries to SanDisk exhaust Round Rock's United States patent rights relating to those products—so that SanDisk is free to import

12

and sell those products in the United States without a license from Round Rock—has been squarely rejected by this Court. For example, in *Fuji Photo Film*, this Court expressly held that "foreign sales can ***never*** occur under a United States patent because the United States patent system does not provide for extraterritorial effect.… In *Jazz*, therefore, ***this court expressly limited first sales under the exhaustion doctrine to those occurring within the United States***." *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005) (emphasis added); *see also Jazz Photo*, 264 F.3d at 1105 ("United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent."); *Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012), *cert. denied*, 133 S.Ct. 1656 (2013). Accordingly, "a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States." *Jazz Photo*, 264 F.3d at 1105 (citing *Boesch v. Graff*, 133 U.S. 697, 701–03 (1890)).

Because there is no dispute that SanDisk did ***not*** purchase any of the accused products "within the United States," exhaustion does not apply as a matter of law. The district court thus erred in granting SanDisk's motion for summary judgment and denying Round Rock's motion for summary judgment on SanDisk's patent exhaustion affirmative defense. *See, e.g.*, *London v. Carson Pirie Scott & Co.*, 946

13

F.2d 1534, 1537 (Fed. Cir. 1991) ("There can be 'no genuine issue as to any material fact' where the nonmoving party's proof is deficient in meeting an essential part of the applicable legal standard, since such failure renders all other facts immaterial."); *Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 278 F.3d 1288, 1295 (Fed. Cir. 2002) ("Summary judgment must be granted against a party who has not introduced evidence sufficient to establish the existence of an essential element of that party's case, on which the party would bear the burden of proof at trial.").

**B.    The District Court's Attempt To Distinguish This Court's Precedent On The Grounds That SanDisk Purchased Flash Memory Chips In Japan From A "Worldwide" Licensee Is Incorrect.**

**1.    This Court Has Held That Even If A Patentee Or Licensee Has The Right To Sell Products Under The Patents Of Multiple Countries, Foreign Sales Cannot Exhaust United States Patent Rights Because Those Sales Are Not Made Under A United States Patent.**

The district court asserted that "the fact that the products were sold under the authority of a world-wide license agreement renders the *Jazz Photo* and *Ninestar* decisions distinguishable." (A28.) But the district court's assertion that this Court has not addressed patent exhaustion with respect to foreign sales made pursuant to a "worldwide license" is incorrect.

Contrary to the district court's reasoning, this Court has held that an unrestricted *foreign* sale of a patented product by a patentee does ***not*** exhaust the

patentee's United States patent rights. *Jazz Photo*, 264 F.3d at 1102–05. In these circumstances, this Court held that "United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Id*. at 1105. Whether products are sold by a licensee (as SanDisk asserts here) or the patentee (as in *Jazz Photo*) is a distinction without a difference.

And to the extent any question remained after *Jazz Photo*, this Court squarely addressed the precise issue here—whether a foreign sale by a licensee with a license to sell in both countries exhausts United States patent rights—in *Fuji Photo Film*, 394 F.3d at 1376. The district court in *Fuji Photo Film* explained the issue as follows:

> ***The Supreme Court's decision in Boesch left open the question whether a foreign sale by the holder of both United States and foreign patents (or its licensee with a license to sell in both countries) "exhausts" the patentee's rights "under the United States patent."*** … Several courts thereafter distinguished *Boesch* on this ground, concluding that, on the one hand, the foreign sale of a patented article by the patentee (or a licensee) constituted exhaustion, while on the other hand the patentee retained its monopoly over items sold abroad by a licensee with no authority to sell the product in the United States….
>
> Prior to its decision in *Jazz v. ITC*, the Federal Circuit was never called upon to address this distinction. ***The record on appeal in Jazz v. ITC, however, placed the issued before the Circuit, which held that in order for a sale to be "under the United States Patent" such that***

> **the patentee's rights are exhausted, the sale must be "in
> the United States."**

*Fuji Photo Film Co. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434, 450 (D.N.J. 2003),

*aff'd,* 394 F.3d 1368 (Fed. Cir. 2005) (emphasis added).[2] On appeal, this Court

found that "the district court correctly applied this court's exhaustion precedent,"

and held that "[t]he patentee's authorization of an international first sale does ***not***

affect exhaustion of that patentee's rights in the United States" because "foreign

sales can ***never*** occur under a United States patent." *Fuji Photo Film*, 394 F.3d at

1376 (emphasis added).

Finally, this Court yet again reiterated the territoriality requirement of patent

exhaustion in *Ninestar*, 667 F.3d at 1378. In *Ninestar*, the appellant argued that in

*Quanta*,[3] the Supreme Court changed the territoriality requirement for patent

exhaustion such that products purchased outside the United States from the

patentee exhausted the patentee's United States patent rights. (A890–91, A894–

---

[2] The district court opinion in *Fuji Photo Film* also makes clear in several other
places that the issue concerned a foreign sale by a licensee with a license to sell in
both countries. *See, e.g., Fuji Photo Film*, 249 F. Supp. 2d at 451 n.21
("Specifically, Question 3 asked the jury to determine the number of cameras sold
by Jazz in or to the United States made from refurbished shells of ***cameras first
sold outside the United States by Fuji or a licensee with the right to sell in both
countries***." (emphasis added)); *id.* at 438 ("Fuji and its licensees manufacture these
disposable cameras for sale both in the United States and abroad."); *see also, e.g.*,
A902–03.

[3] *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008).

98.) This Court again rejected this position. *Ninestar*, 667 F.3d at 1378 ("*Quanta Computer, Inc. v. LG Electronics, Inc.* did not eliminate the first sale rule's territoriality requirement.") (quoting *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1371 (Fed. Cir. 2010)).

The district court's rationale for distinguishing the *Jazz Photo* and *Ninestar* cases has thus already been rejected by this Court in *Fuji Photo Film*. Irrespective of whether or not the patentee here authorized an international first sale, that sale "does ***not*** affect exhaustion of that patentee's rights in the United States" because "foreign sales can ***never*** occur under a United States patent." *Fuji Photo Film*, 394 F.3d at 1376 (emphasis added).

### 2. The Patentee Here Was Never Compensated Under The United States Patents-In-Suit For The Infringing SanDisk Products.

The district court also sought to distinguish this Court's precedent that foreign sales can never occur under a United States patent by asserting that "Toshiba already gave consideration for the right to import devices embodying the patented invention." (A28.) The district court's reasoning is incorrect for several reasons.

First, the district court's assertion that the patentee was already compensated under the patents-in-suit for the products at issue here because "Toshiba already gave consideration for the ***right*** to import devices embodying the patented

17

inventions" (A28 (emphasis added)) misapplies patent exhaustion law. Patent exhaustion applies to the particular articles actually sold under a patent, not to intangible license rights. *See, e.g., Quanta*, 553 U.S. at 631 ("[T]he authorized sale of an ***article*** which is capable of use only in practicing the patent is a relinquishment of the patent monopoly ***with respect to the article sold***.") (citation omitted and emphasis added); *Intel Corp. v. ULSI Sys Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent. The patent owner's rights with respect to the product end with its sale and a purchaser of such a product may use or resell the product free of the patent." (citations omitted)).

Second, with respect to the products at issue here, Toshiba paid ***nothing*** under Round Rock's United States patents for selling those products in Japan. Toshiba paid for the ***right*** to sell patented products under Micron's patents



CONFIDENTIAL MATERIAL OMITTED

(A443 (emphasis added); A446 (emphasis added); *see also* A445 (defining "MICRON PATENTS" and "LICENSED PRODUCT").) But Toshiba exercised its right with respect to the products at issue here, if at all, only in Japan. Accordingly, Toshiba's license to Round Rock's '791 and '053 patents was never implicated when Toshiba's joint venture subsidiaries sold products in Japan, as no license to these patents was required for such sales. Indeed, "[i]t is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad…. They do not thereby provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013). That is the reason that "foreign sales can ***never*** occur under a United States patent…." *Fuji Photo Film*, 394 F.3d at 1376 (emphasis added). Accordingly, to the extent Toshiba paid anything at all under the license agreement for the sale of products in Japan, such payment was for use of Japanese patent rights, not United States patent rights. That does not give rise to United States patent exhaustion. *See Jazz Photo*, 264 F.3d at 1105 ("United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.").

Third, the district court's reasoning is inconsistent with the Micron-Toshiba license agreement. The agreement grants ***Toshiba*** (including its "Subsidiaries") the

19

right to make, sell, and import licensed products. (A446.) Toshiba thus acquired the rights for **_Toshiba_** to make, sell, and import licensed products in the United States under Micron's United States patents, and for **_Toshiba_** to make, sell, and import products in Japan under Micron's Japanese patents. Toshiba did **_not_** pay Micron for any rights on behalf of its customers to purchase products in one country and import those products into another country and re-sell them there. ■



(A446 (emphasis added).)

■ the rights of Toshiba's customers, including SanDisk, are limited by the exhaustion doctrine—a customer is free to use and re-sell products legally acquired from a licensee in the country where it purchases the products—as the only compensation paid to the patentee for those particular products are under the patentee's patents in that country. The exhaustion doctrine does **_not_** authorize purchasers of a product to import the product into a different country and use or re-sell the product there. *See Fuji Photo Film*, 394 F.3d at 1376. Indeed, as the district court articulated in the *Fuji Photo Film* case later affirmed by this Court, anyone

CONFIDENTIAL MATERIAL OMITTED

purchasing a product in the territory of one sovereign country ought to be on notice that the use or sale of that product in another sovereign country may be impermissible:

> Nor is the proposition that foreign sales should not eviscerate United States patent rights without substantial justification. Indeed, it follows directly from the territorial nature of the patent laws themselves…. As one leading commentator has noted, "[s]ince a patent only extends to the borders of the country using it, it makes sense to limit the right to make, use or sell the product to the same borders." Martin J. Adelman, Patent Law Perspectives § 3.6[1]. ***Thus, "anyone purchasing a product in the territory of one sovereign country ought to be on notice that the use or sale of that product in another sovereign country may be impermissible."*** *Id.* This was precisely the balance struck by the Federal Circuit in *Jazz v. ITC*.

*Fuji Photo Film*, 249 F. Supp. 2d at 450 n.20 (emphasis added).

The district court's conclusion that Toshiba already compensated Round Rock (or the previous patent holder Micron) for SanDisk's infringement of the '791 and '053 patents is thus incorrect. The ***only*** party that used Round Rock's United States patent rights with respect to the products at issue here is ***SanDisk***, who is indisputably not licensed to do so. SanDisk's importation and sale of the patented products is thus infringement, and the district court's judgment of non-infringement should be reversed for this additional reason.

### 3. The *Kirtsaeng* Supreme Court Copyright Decision Did Not Overrule Or Otherwise Change The Law That Foreign Sales Can Never Exhaust United States Patent Rights.

The district court also sought to support its decision by asserting that the Supreme Court *Kirtsaeng* decision "implicitly suggests" that patent exhaustion has no territorial limitation. (A29.) *Kirtsaeng* held that copyrighted works sold overseas were subject to the statutory copyright first sale provision. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351, 1354–56 (2013) (relying upon 17 U.S.C. § 109(a) (2008)). *Kirtsaeng* does not support the district court for several reasons.

First, this Court's precedent expressly recognizes that the territoriality rules for patent exhaustion and copyright first sale are ***different***. Patent exhaustion requires "a first sale in the United States." *Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1293 (Fed. Cir. 2007). "A different rule applies in the copyright context" where copyright first sale applies "even if the first sale occurred abroad." *Id*. at 1293 n.13. *Kirtsaeng* thus confirmed this Court's precedent— copyright first sale applies even if the first sale occurs abroad. *See Kirtsaeng*, 133 S.Ct. 1351. It did not purport to overrule this Court's precedent that patent exhaustion requires a first sale in the United States. *Id*. The district court's conflation of these differing rules thus contradicts this Court's precedent.

Second, *Kirtsaeng* relied upon statutory interpretation: (i) the Copyright Act's explicit statement that the importation ban is subject to the statutory first sale

provision; and (ii) the first sale provision's applicability to any copy "lawfully made under this title." *See id.* at 1354–55. No such provisions exist in the United States Patent Act. *See* 35 U.S.C. §§ 1 *et seq*. The reasoning thus does not apply to patent exhaustion.

Third, the patent exhaustion doctrine is fundamentally different than the statutory copyright "first sale" provision addressed in *Kirtsaeng*. For example, United States patent laws and United States patents have no extraterritorial effect. *See, e.g.*, *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1360 (Fed. Cir. 2004) ("Further, it is well known that United States patent laws 'do not, and were not intended to, operate beyond the limits of the United States.'" (citation omitted)). Each country may have its own patent office and issue its own patents under its own patent laws. Exhaustion of a United States patent thus applies ***only*** to sales within the United States. *See Fuji Photo Film*, 394 F.3d at 1376 ("[F]oreign sales can ***never*** occur under a United States patent…. In *Jazz*, therefore, this court expressly limited first sales under the exhaustion doctrine to those occurring within the United States." (emphasis added)). The Copyright Act, to the contrary, ***does*** have extraterritorial effect. *See Kirtsaeng*, 133 S.Ct. at 1359 (noting that "***§104 of the Act itself says that works 'subject to protection under this title 'include*** unpublished works' 'without regard to the nationality or domicile of the author,' and ***works 'first published' in any one of the nearly 180 nations that have signed***

23

*a copyright treaty with the United States*." (emphasis added)). Consistent with this extraterritorial effect, the statutory copyright "first sale" provision provides no territorial limitation, stating simply that "the owner of a particular copy or phonorecord lawfully made under this title … is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a).

Accordingly, the *Kirtsaeng* copyright decision does not support the district court's disregard of this Court's precedent that "foreign sales can **never** occur under a United States patent…." *Fuji Photo Film*, 394 F.3d at 1376 (emphasis added).

II.    **Even If Foreign Sales Could Exhaust United States Patent Rights, The District Court Erred In Concluding That SanDisk Proved Patent Exhaustion.**

A.    **The District Court Misinterpreted The Micron-Toshiba License Agreement In Concluding That SanDisk Purchased Components Of The Accused Products From A Licensee.**

The district court also misinterpreted the Micron-Toshiba license agreement in finding that SanDisk proved its patent exhaustion defense. "Interpretation of contract terms is a matter not unique to our exclusive jurisdiction and is therefore reviewed under regional circuit law." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006). The terms of the contract at issue here provide that it "shall be governed by and interpreted in accordance with

the laws of the State of California, U.S.A., without regard to its conflict of law principles." (A449 at § 7.1.) Under Ninth Circuit law, "[t]he determination of whether contract language is ambiguous is a matter of law. When the interpretation includes a review of factual circumstances surrounding the contract, the principles of contract interpretation applied to those facts present issues of law" which are reviewed *de novo*. *In re U.S. Fin. Sec. Litig.*, 729 F.2d 628, 632 (9th Cir. 1984) (citations omitted). Further, under California Law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641.

SanDisk purchases flash memory chips in Japan from three Toshiba-SanDisk joint ventures created between 2004 and 2011—Flash Partners, Ltd., Flash Alliance, Ltd., and Flash Forward, Ltd. (A257–58 at 5:18–6:10; A533 at ¶ 3.) These joint ventures were created years *after* the August 4, 1997, Effective Date of the Micron-Toshiba license agreement in question. (A443.) The district court interpreted the agreement to grant a license to these joint ventures to practice the patents-in-suit. This is incorrect for several reasons.

First, the Micron-Toshiba license agreement ████████████████████

████████████████████████████████████████████████████████

████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

Creating a new joint venture subsidiary—particularly as a joint venture with an unlicensed competitor such as SanDisk—effectively does this very thing. *Cf. U.S. v. Penn-Olin Chem. Co.*, 378 U.S. 158, 169 (1964) (explaining that a joint venture "is the chosen competitive instrument of two or more corporations previously acting independently and usually competitively with one another. The result is 'a triumvirate of associated corporations.'" (citation omitted)); *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1261 (9th Cir. 2001) ("[A joint venture] exists where there is an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an

CONFIDENTIAL MATERIAL OMITTED

understanding as to the sharing of profits and losses and a right of joint control."
(citation omitted)). ███████████████████ these new joint ventures—
which did not exist at the time of the license agreement—should thus be excluded
from the scope of the license ████████████

Second, while the Micron-Toshiba license agreement extends to subsidiaries
of the parties, ████████████████████████████████████████████
████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████ The new joint ventures should not receive the benefit of the license
agreement for this additional reason. *Compare Imation Corp. v. Koninklijke Philips
Electronics N.V.*, 586 F.3d 980, 983, 988 (Fed. Cir. 2009) ("Section 13 defines
'Subsidiary' as 'any … form of business organization as to which the party ***now or***

CONFIDENTIAL MATERIAL OMITTED

***hereafter has*** more than a fifty percent (50%) ownership interest.' … Looking to the plain language of the 'Subsidiary' definition, the use of the phrase 'now or hereafter' connotes that Subsidiaries may come into existence at some unspecified future time.").



These provisions are relevant in interpreting the agreement. *See, e.g.*, Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

**CONFIDENTIAL MATERIAL OMITTED**

The district court thus erred by concluding that that Toshiba-SanDisk joint ventures are licensed under the Micron-Toshiba license agreement. The district court's finding of patent exhaustion based upon sales from these joint ventures should be reversed for this additional reason.

**B.** **Even If The Foreign Sales Of *Flash Memory Chips* To SanDisk Exhausted Round Rock's United States Patent Rights In Those Flash Memory Chips, Those Sales Cannot Exhaust Round Rock's Patent Rights In SanDisk's *Controller Chips*.**

The district court also erred by applying the exhaustion doctrine to accused circuitry that SanDisk does ***not*** purchase from any alleged licensee. In that regard, Round Rock came forth with evidence that SanDisk incorporates infringing controller chips ***and*** infringing flash memory chips into its products. The district court found that patent exhaustion applies to both the infringing controller chips and the infringing flash memory chips simply because SanDisk purchases the flash memory chips from the Toshiba-SanDisk joint ventures. (A30–31.) As discussed below, this finding is contrary to the evidence and law with respect to the controller chip infringement.

### 1. SanDisk Incorporates Round Rock's Patented Circuitry In Two Different Components Of The Accused Products—The Flash Memory Chips Purchased From The Alleged Licensee And The Controller Chips Designed By SanDisk.

As illustrated in the following representative block diagram, each of the accused SanDisk products combine a "controller" chip (highlighted in green) and a "flash memory" chip (highlighted in yellow), among other things:



(A1123 (emphasis added); *see also* A2121; A2155.)

Round Rock separately accused circuitry in both the controller chips and the flash memory chips of infringing the '791 and '053 patents: (i) some SanDisk products infringe based primarily upon circuitry in the controller chips; and (ii) some SanDisk products infringe based primarily upon circuitry in the flash memory chips. Round Rock thus provided one set of claim charts directed towards the controller chip based infringement and another set of claim charts directed towards the flash memory chip based infringement, as summarized below:

*Controller Chip Based Infringement:*

| Patent | Accused Products | Claim Charts |
|--------|------------------|--------------|
| '791 patent | SanDisk's iNAND products that comply with eMMC 4.41 or later and have "DDR" mode and SD products with "DDR50" mode. | A2153–82; *see also* A1944–66. |
| '053 patent | SanDisk's iNAND products that comply with eMMC 4.41 or later. | A2119–40; *see also* A1981–89. |

*Flash Memory Chip Based Infringement:*

| Patent | Accused Products | Claim Charts |
|--------|------------------|--------------|
| '791 patent | SanDisk's memory chips that implement Toggle mode or HSI mode. | A1543–70; *see also* A1967–80. |
| '053 patent | SanDisk's memory chips that implement ████████. | A2141–52; *see also* A1990–95. |

The *only* component of the accused products that SanDisk alleged it purchased from a licensee are the flash memory chips. (A257–58 at 5:18–6:10; A533 at ¶ 3.) But even though SanDisk indisputably does not purchase the controller chips from a licensee, the district court concluded that the doctrine of patent exhaustion applied to both the controller chip based infringement claims and the flash memory chip based infringement claims. (A30–31.) This is legally incorrect and unsupported by the evidence of record.

CONFIDENTIAL MATERIAL OMITTED

**2.    Purchasing Patented Flash Memory Chips From An Alleged Licensee Does Not Grant SanDisk A License To Incorporate Round Rock's Patented Technology Into Its Own Controller Chips.**

Even if SanDisk's purchase of flash memory chips in Japan from the Toshiba-SanDisk joint ventures could exhaust Round Rock's United States patent rights with respect to those memory chips (which it cannot as discussed in section I, *supra*), exhaustion would not apply to the controller chip based infringement as SanDisk does not purchase its controller chips from an alleged licensee.

First, purchasing patented flash memory chips from a licensee does not grant SanDisk a license to incorporate Round Rock's patented technology into its own separately manufactured controller chips. Indeed, exhaustion "restricts a patentee's rights *only as to the 'particular article' sold*…." *Bowman v. Monsanto Co.*, 133 S.Ct. 1761, 1766 (2013) (citation omitted and emphasis added); *see also Quanta*, 553 U.S. at 631 ("[T]he authorized sale of an *article* which is capable of use only in practicing the patent is a relinquishment of the patent monopoly *with respect to the article sold*." (citation omitted and emphasis added)). It does not convey a general license to incorporate the invention into other products or make new copies of the patented item. *See Bowman*, 133 S.Ct. at 1766 (explaining that the patent exhaustion doctrine "leaves untouched the patentee's ability to prevent a buyer from making new copies of the patented item.").

32

Second, the Micron-Toshiba license agreement ████████████ ██████████████████████████—products that combine patented flash memory chips (that SanDisk contends it purchases from a licensee) with patented controller chips (that SanDisk indisputably does ***not*** obtain from a licensee):



(A448 (emphasis added).) SanDisk thus has no legal right to incorporate Round Rock's patented technology into its own controller chips simply because it combines those controller chips with allegedly licensed flash memory chips.

### 3. The District Court Addressed Only The Flash Memory Chip Based Infringement And Improperly Ignored The Controller Chip Based Infringement.

The district court's opinion also makes clear that it ignored the substantial evidence submitted by Round Rock relating to the controller chip based infringement. In support of its decision, the district court found:

> Round Rock's own infringement contentions and its expert's opinions reflect that the memory chips fully or substantially embody the patent claims in suit, with respect to the '053 and the '791 patents. As such, it cannot now show that the claims depend on the controllers.

33

**CONFIDENTIAL MATERIAL OMITTED**

(A30–31.) And SanDisk did not address the controller chip based infringement either, asserting simply that "Round Rock accused the memory chips bought from Toshiba of infringing both the '791 and '053 patents in its infringement contentions." (A2199.)

But the evidence of record demonstrates that Round Rock and its expert set forth *separate* infringement claims and evidence against circuitry in both the controller chips and the flash memory chips. So while it is correct that Round Rock accused circuitry in the flash memory chips (*see* A1543–70, A1967–80 ('791 patent); A2141–52, A1990–95 ('053 patent)), the district court's suggestion that Round Rock and its expert did not also come forth with evidence of infringement against circuitry in the controller chips is contrary to the evidence (*see* A2153–82, A1944–66 ('791 patent); A2119–40, A1981–89 ('053 patent)). Neither SanDisk nor the district court gave any rationale for ignoring all this evidence of the controller based infringement.

Further illustrating that the district court simply ignored the controller chip infringement, the district court concluded that the accused controllers were simply "standard parts" that met the "processor" limitation of the claims:

> While SanDisk may "custom design" these particular controllers, the patent claims merely recite a "processor," with no indication that any of the inventive aspects of the claims depend on the specifics of the processor, and there is no indication SanDisk's "custom design" transforms its controllers into something meaningfully distinguishable

34

> from "the application of common processes or the
> addition of standard parts."

(A30.) But Round Rock did not even allege that SanDisk's controller chips met the "processor" limitations as part of the controller chip based infringement.[4] Rather, Round Rock accused the "host processor" of the customer devices (such as "the camera, laptop, cellular telephone, or other host device")—with which the customers combine the accused products—of meeting the "processor" limitation of claim 14 of the '791 patent. (A2178–79.) Similarly, Round Rock accused the "processor" of the customer equipment (or equipment used to test the products) of meeting the "processor" limitation of claim 24 of the '053 patent. (A2120.) These "processors" are completely separate from the accused SanDisk controller chips.

Moreover, the claim charts provided by Round Rock's expert and the cited evidence therein demonstrate that in connection with the controller chip based infringement, the inventive aspects lie within the controller chips, ***not*** the flash memory chips or external processors. For example, the claim charts identify evidence that: (i) the flash memory chips SanDisk purchases from the Toshiba-SanDisk joint ventures meet the "array of non-volatile memory cell" limitations (highlighted in yellow below); (ii) external processors meet the "processor"

---

[4] The district court's reasoning does not have any apparent connection to asserted claims 1, 3, and 4 of the '791 patent, as those claims do not even recite a "processor." (A126.)

limitations (highlighted in blue below); and (iii) SanDisk's own circuitry—that it does *not* purchase from any alleged licensee—meets every other limitation:

<u>**'791 Patent Claims 1, 3, 4, and 14:**</u>

**1**. A flash memory comprising:
an array of non-volatile memory cells;
sense amplifier circuitry coupled to the array, wherein the
    sense amplifier circuitry detects a differential voltage
    from the array of non-volatile memory cells;
data connections; and
output circuitry to provide output data on the data con-
    nections on rising and falling edges of a clock signal.


**3**. The flash memory of claim **1** further comprising input circuitry to receive input data on the data connection on rising and falling edges of a clock signal.


**4**. A flash memory comprising:
an array of non-volatile memory cells;
sense amplifier circuitry coupled to the array, wherein the
    sense amplifier circuitry detects a differential voltage
    from the array of non-volatile memory cells;
data connections;
a clock signal connection to receive a clock signal;
output circuitry to provide output data on the data con-
    nections on rising and falling edges of the clock signal;
    and
input circuitry to receive input data on the data connec-
    tions on rising and falling edges of the clock signal.

14. A processing system comprising:
    a processor; and
    a double data rate flash memory coupled to the processor
        comprising:
        an array of non-volatile memory cells;
    a clock signal connection to receive a clock signal; and
    control circuitry coupled to the array to provide two
        data access operations per clock cycle.

(A126–27 (emphasis added); *see also* A2154–82 (claim chart).)

## '053 Patent Claim 24:

24. An electronic system comprising:
    a processor that performs operational tasks of the elec-
        tronic system; and
    a flash memory device having a high data throughput
        mode and a low power mode, the flash memory device
        comprising:
        a memory array for storing data input to the flash
            memory device;
        a non-volatile memory location that stores a mode
            control bit, one of the high data throughput mode or
            the low power mode being selected in response to a
            state of the mode control bit; and
    write circuitry that couples the input data to the
        memory array, the write circuitry varying a quantity
        of data being programmed to the memory array in a
        predetermined time in response to the selected mode.

(A137 (emphasis added); *see also* A2120–40 (claim chart).)

It is thus the flash memory chips—not the controller chips—that are "standard parts" that do not include the inventive aspects of the claims. These flash memory chips thus cannot give rise to patent exhaustion with respect to the controller chip based infringement, because exhaustion is triggered by the sale of

products when "their only reasonable and intended use [is] to practice the patent" and "they 'embodie[d] essential features of [the] patented invention." *Quanta*, 553 U.S. at 631 (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942)). The district court's ruling is thus contrary to the evidence with respect to the controller chip based infringement and should be reversed for this additional reason.

## III. The District Court Erred In Denying Summary Judgment Of Infringement Of Claim 14 Of The '791 Patent.

Round Rock moved for summary judgment of infringement of claim 14 of the '791 patent by SanDisk's making, using, selling, offering to sell, and importing of its HSI mode and Toggle mode products. (A915–19.)[5] SanDisk opposed solely on the basis of its patent exhaustion affirmative defense (A1581), which the district court adopted. (A23–31; A44.) But because the district court's ruling on patent exhaustion should be reversed as set forth in sections I and II.A, *supra*, the district court's denial of Round Rock's motion for summary judgment should also be reversed as SanDisk has no defense to infringement. *See, e.g.*, Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no

---

[5] Round Rock also moved for summary judgment of infringement of claim 24 of the '053 patent by SanDisk's ██████████████ products. (A924–30.) But SanDisk raised a defense not yet addressed by the district court. (A1582–90.) The record is thus not yet sufficiently developed for a meaningful review of this issue. *See Jones-Hamilton*, 973 F.2d at 694 n.2.

CONFIDENTIAL MATERIAL OMITTED

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). Accordingly, Round Rock respectfully requests that this Court reverse the district court's denial of summary judgment of infringement, and remand with instructions to enter summary judgment of infringement of claim 14 of the '791 patent by SanDisk's HSI mode and Toggle mode products.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court and remand this case to the district court with instructions to enter summary judgment of infringement of claim 14 of the '791 patent by SanDisk's HSI mode and Toggle mode products and for further proceedings consistent with this Court's opinion.

Respectfully submitted,

October 3, 2014                    /s/ Jon T. Hohenthaner

Jon T. Hohenthaner
Richard M. Cowell
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400
jhohenthaner@desmaraisllp.com
rcowell@desmaraisllp.com

*Counsel for Defendant-Appellant*
*Round Rock Research LLC*

# ADDENDUM

# TABLE OF CONTENTS

1.  Order Granting In Part And Denying In Part Motion For
    Summary Judgment Re Patent Exhaustion................................................ADD1

2.  Order Re Additional Motions For Partial Summary
    Judgment And Motions To Strike........................................................ADD10

3.  Stipulation And Order Dismissing Certain Claims And
    Entering Final Judgment ......................................................................ADD17

4.  Judgment ............................................................................................ADD22

5.  U.S. Patent No. 6,570,791....................................................................ADD23

6.  U.S. Patent No. 6,845,053....................................................................ADD33

I hereby certify that the annexed
instrument is a true and correct copy
of the original on file in my office.

ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California

by: Gina Agustine
Deputy Clerk
Date: July 25, 2014

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAN DISK CORPORATION,<br><br>          Plaintiff,<br><br>   v.<br><br>ROUND ROCK RESEARCH LLC<br><br>          Defendant.<br><br>_____/ | No. C 11-5243 RS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT RE PATENT EXHAUSTION** |

## I. INTRODUCTION

Plaintiff SanDisk Corporation brought this action seeking declaratory relief that its products do not infringe certain patents held by defendant Round Rock Research LLC, and/or that the patents are invalid. The parties have now each brought motions seeking partial summary judgment regarding particular issues. As to three of the four patents remaining in suit, a threshold issue is whether the doctrine of patent exhaustion applies to bar Round Rock from pursing its infringement claims against SanDisk.

There is no material factual dispute that the infringement claims arise at least in part from SanDisk's use of semiconductor memory devices it purchased from Toshiba entities that were licensed by Round Rock's predecessor to make, use, and sell the inventions of the patents on a world-wide basis. The primary legal question is whether, under the circumstances here, the fact that

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

the sales from Toshiba to SanDisk occurred overseas precludes application of the patent exhaustion doctrine. Although the law is not fully settled, for the reasons explained below, SanDisk's motion seeking a determination that patent exhaustion bars the infringement claims arising from the Toshiba memory will be granted, with respect to U.S. Patent No. 6,845,053 and U.S. Patent No. 6,570,791. The motion will be denied in part with respect to U.S. Patent No. 5,682,345 because SanDisk has not shown that the infringement claims under that patent are limited to the Toshiba memory.

## II. BACKGROUND

Round Rock describes itself as a technology research and licensing company that holds thousands of patents and pending patent applications. Round Rock is what is commonly described as a "non-practicing entity"—that is, it does not manufacture or market products utilizing its patented inventions, but instead seeks licensing agreements from parties who do make and sell such products, or pursues litigation against them when it deems it necessary to do so. Round Rock acquired its patent portfolio from Micron Technology. The claimed inventions relate to a variety of products and technologies, such as televisions, cell phones, computers, cameras, processors, and memory products, among other things. SanDisk, in turn, designs, manufactures, and sells a wide variety of flash memory devices.

During the course of this litigation, the scope of the parties' disputes have narrowed. At this juncture, four patents held by Round Rock remain in issue. The '053 patent relates generally to flash memory devices that allow a "mode" to be selected, for purposes of adjusting the tradeoff between performance speed and power consumption. The '345 patent claims a device—a non-volatile data storage unit—and a method for controlling its operation. The '791 patent relates to flash memory designed to be compatible with so called "double data rate" dynamic random access memory chips ("DDR DRAM"). Finally, U.S. Patent No. 6,383,839 relates to mounting semiconductor devices on circuit boards perpendicularly to the surface of the boards. Of these four patents, only the '839 is not implicated by the patent exhaustion issue.

**ADD2**

As to the products accused of infringing the other three patents, SanDisk bought the flash memory chips incorporated in those accused products from entities in the Toshiba corporate family. There is no dispute that before the patents were transferred to Round Rock, Micron entered into a written license agreement with Toshiba, granting Toshiba a "nonexclusive, non-transferable, royalty-free, world-wide license, without the right to sublicense third parties, to make, have made, use, sell, offer for sale, import or otherwise dispose of licensed products and to use any methods covered by Micron patents . . . ."  SanDisk contends that, as a result, the '053, '345, and '791 patents are exhausted, and do not support an infringement claim based on the memory chips it obtained from Toshiba.  It is undisputed that the sales between Toshiba and SanDisk took place in Japan.  Round Rock contends that exhaustion of United States patent rights simply does not arise from sales made outside the territorial jurisdiction of this country.

## III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted).  If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which it bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly

United States District Court
For the Northern District of California

3

supported motion for summary judgment simply by alleging some factual dispute between the
parties.  To preclude the entry of summary judgment, the non-moving party must bring forth
material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . .
Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there
is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*,
475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including
questions of credibility and of the weight to be accorded particular evidence.  *Masson v. New Yorker
Magazine, Inc*., 501 U.S. 496 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at
588 (1986).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the
nonmoving party, coupled with undisputed background or contextual facts, are such that a rational
or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v.
Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987).  "[S]ummary judgment will not lie if
the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  However, "[w]here the
record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there
is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

IV. DISCUSSION

A.  Applicability of patent exhaustion to overseas sales

Under 35 U.S.C. § 271, a defendant can only be liable for infringement if the allegedly
infringing acts are carried out "without authority." 35 U.S.C. §§ 271(a), (f), (g). "The longstanding
doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates
all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc*., 553 U.S. 617, 625 (2008).
The exhaustion doctrine prohibits patent holders from selling a patented article and then "invoking
patent law to control postsale use of the article." *Id.* at 638. The underlying rationale is that an

4

**United States District Court**
For the Northern District of California

1   unconditional sale of a patented device generally exhausts the patentee's right to control the

2   purchaser's use of that item thereafter because the patentee has bargained for and received the full

3   value of the goods. *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed.Cir. 2010) (en banc); *see also*,

4   *U.S. v. Masonite Corp.*, 316 U.S. 265, 278 (1942) ("The test has been whether or not . . . it may

5   fairly be said that the patentee has received his reward for the use of the article."). Exhaustion,

6   however, "is triggered only by a sale authorized by the patent holder." *Quanta*, 553 U.S. at 636.

7   To argue that patent exhaustion does not apply here, Round Rock relies on the *Jazz Photo*

8   line of cases[1] and *Ninestar Tech. Co. v. ITC*, 667 F.3d 1373 (Fed.Cir. 2012). Each of these cases

9   refused to apply patent exhaustion where the products in issue were first sold outside the United

10   States. *See*, *e.g.*, *Jazz Photo Corp. v. ITC*, 264 F.3d at 1105 ("United States patent rights are not

11   exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the

12   authorized first sale must have occurred under the United States patent.").

13   SanDisk, in turn, points to *Quanta*, in which the Supreme Court expressly cautioned against

14   "the danger of allowing . . . an end-run around exhaustion." 553 U.S. at 630. Although the Court

15   was addressing whether exhaustion applies to method claims, this District has previously observed

16   that exempting overseas sales from the doctrine would constitute a similarly unjustifiable "end run."

17   *LG Electronics., Inc. v. Hitachi Ltd.*, 655 F. Supp. 2d 1036, 1044-45. (N.D. Cal. 2009).[2] Where, as

18   here and as in *LG Electronics*, the patentee has negotiated and obtained consideration for granting

19   an express world-wide license to "make, have made, use, sell, offer for sale, import or otherwise

20   dispose of" products embodying the inventions, permitting the patentee to pursue infringement

21   claims against "any downstream purchasers" would, in effect, allow the kind of double recovery the

22   exhaustion doctrine ordinarily forecloses.

---

[1] *Jazz Photo Corp. v. ITC*, 264 F.3d 1094 (Fed.Cir. 2001), *Fuji Photo Film Co., Ltd. v. Benun*, 463 F.3d 1252 (Fed.Cir. 2006), and *Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed.Cir. 2010).

[2] The *LG Electronics* decision concluded that the first two *Jazz Photo* cases were simply no longer good law in light of *Quanta*. 655 F. Supp. 2d at 1046. This Court is not free to reach the same conclusion now, because in the interim the Federal Circuit held in *Benun* and *Ninestar* that *Quanta* did not eliminate the territoriality issue. *See Benun*, 605 F.3d at 1371; *Ninestar*, 667 F.3d at 1378. Nevertheless, for reasons discussed below, the *Jazz Photo* line is distinguishable.

5

1    As observed in *Multimedia Patent Trust v. Apple, Inc.* 2012 WL 6863471 (S.D. Cal. 2012)

2 ("*MPT*") the fact that the products were sold under the authority of a world-wide license agreement

3 renders the *Jazz Photo* and *Ninestar* decisions distinguishable. *See* 2012 WL 6863471 at *5 ("those

4 cases only involved foreign sales made directly by the patentee and did not involve sales made

5 pursuant to a unconditional worldwide license.") The distinction is significant because the

6 gravamen of the *Jazz Photo* line is that "a lawful foreign purchase does not obviate the need for

7 license from the United States patentee before importation into and sale in the United States." *Jazz*

8 *Photo*, 264 F.3d at 1105. Thus, while the mere purchase of an item overseas that embodies a U.S.

9 patent may not give the purchaser a right to import it into the United States, here Toshiba had such a

10 right under the parties' negotiated license agreement. Round Rock does not suggest that if Toshiba

11 itself had shipped the products to this country prior to resale, there still would have been a viable

12 infringement claim against Toshiba or any of its customers.

13    Round Rock (through its predecessor Micron) in effect had thereby already exercised its

14 rights under U.S. Patent law by granting a license to Toshiba, for consideration, to import patented

15 technology into the United States, if it so chose (among the other rights conferred by the world-wide

16 license). In contrast, the patentees in the *Jazz Photo* line of cases and *Ninestar* merely sold products

17 in overseas retail markets, without expressly granting rights to import those items into this country.[3]

18 As such import rights were not part of the sales, it could reasonably be said that the patentee had

19 received no consideration "under" any U.S. Patent, and therefore that no exhaustion arose.

20 Allowing the patentees to pursue infringement claims based on the subsequent importation of the

21 products into this country did not represent a second attempt to collect for the same right.

22    Here, in contrast, Toshiba already gave consideration for the right to import devices

23 embodying the patented inventions. That title to the chips passed before the shipping to this country

24 took place is too thin a reed on which to permit the patentee an "end run" around the principle that it

---

25  [3] A district court opinion in *Fuji Photo Film Co. v. Jazz Photo Corp.,* 249 F.Supp.2d 434 (D.N.J.

26 2003) indicated that at least in that instance some of the products had been sold by licensees with a

27 right to sell in the United States, and that such a fact did not alter its analysis. None of the circuit

court opinions, however, expressly discussed the point.

28

may only recover once. The *Jazz Photo* line of cases and *Ninestar* do not address these

circumstances, and therefore are not governing, as recognized in *MPT*. *See* 2012 WL 6863471 at

*5; *see also*, *Tessera, Inc. v. ITC*, 646 F.3d 1357, 1369-70 (Fed. Cir. 2011) (applying, without

discussion, exhaustion doctrine in context of chips sold by foreign licensee and thereafter imported).

In urging that exhaustion applies, SanDisk also places heavy emphasis on *Kirtsaeng v. John Wiley*

*& Sons, Inc.*, 133 S.Ct. 1351 (2013), which held that the "first sale" doctrine in copyright law

applies without territorial limitation.[4]  Because *Kirtsaeng* analyzed and applied provisions of the

Copyright Act, it is not directly controlling in the patent context.  Nevertheless, *Kirtsaeng* provides

at least some additional support for the notion that it would be inconsistent with the theoretical

underpinnings of the exhaustion doctrine to apply a territorial limitation.  In construing the present

statutory language, *Kirtsaeng* observed that the common law first sale doctrine in copyright, "makes

no geographical distinctions."  133 S.Ct. at 1363.  The Court concluded that the Copyright Act did

not change the common law rule.  *Id.*  As the Patent Act is silent on the point, it also has not altered

the common law. Thus, unless there is a basis to conclude that the common law approach should

differ between patent and copyright, *Kirtsaeng* implicitly suggests the result reached here is

appropriate.[5]

B.  Identity of Licensees

Round Rock contends that even assuming exhaustion applies where a product is sold under

the auspices of a world-wide license, there is still a question as to whether the particular Toshiba

entities that sold the chips in issue were licensees under the Micron-Toshiba agreement.  Round-

---

[4] First sale doctrine in copyright is conceptually analogous to patent exhaustion. *See Kirtsaeng*, 133 S.Ct. at 1355 ("In copyright jargon, the 'first sale' has 'exhausted' the copyright owner's § 106(3) exclusive distribution right.").

[5] It plainly is SanDisk's belief that the *Jazz Photo* line of cases was at least impliedly superseded by *Quanta* and *Kirtsaeng*, if not wrongly decided from the outset.  Because *Ninestar* expressly held that the rule survived *Quanta*, and because *Kirtsaeng* construed the Copyright Act, not patent law, any such argument must be presented at the appellate level, not here.

United States District Court
For the Northern District of California

1  Rock's sole argument is that while the language of the agreement undeniably encompasses

2  "subsidiaries," it uses the present tense in the definition; e.g. "a legal entity of which a PARTY

3  hereto owns or controls directly or indirectly more than fifty percent (50%) of the shares . . . ."  As

4  the particular subsidiaries that made the sale came into legal existence after the effective date of the

5  agreement, Round Rock argues they are outside its scope.  Round Rock, however, has offered no

6  legal authority or factual basis, however, to support such a restrictive and counter-intuitive reading

7  of the contract language.   It is undisputed that the sales were made by entities that fell within the

8  language of the definition at the time of the sales.  Reading the present tense language as effectively

9  imposing a past tense requirement—i.e. that the entities were owned or controlled by Toshiba by the

10  time the contract first became effective—is unwarranted.

11

12       C.  Scope of the exhaustion

13       Finally, Round Rock argues that even assuming patent exhaustion applies with respect to the

14  memory chips SanDisk acquired from Toshiba, the doctrine cannot insulate SanDisk from liability

15  for infringement claims based on its own *controllers*, rather than the Toshiba memory.  Round

16  Rock's argument fails as to both the '053 and the '791 patents.

17       As to those two patents, Round Rock relies on its assertion that "key" or "core" elements are

18  performed by the controller chips, which are "custom-designed" by SanDisk.  Under *Quanta*, a

19  product substantially embodies the patent [where] the only step necessary to practice the patent is

20  the application of common processes or the addition of standard parts."  553 U.S. at 634.  While

21  SanDisk may "custom design" these particular controllers, the patent claims merely recite a

22  "processor," with no indication that any of the inventive aspects of the claims depend on the

23  specifics of the processor, and there is no indication SanDisk's "custom design" transforms its

24  controllers into something meaningfully distinguishable from "the application of common processes

25  or the addition of standard parts."

26       Moreover, Round Rock's own infringement contentions and its expert's opinions reflect that

27  the memory chips fully or substantially embody the patent claims in suit, with respect to the '053

28

**ADD8**

**United States District Court**
For the Northern District of California

1   and the '791 patents. As such, it cannot now show that the claims depend on the controllers. *See LG*

2   *Electronics*, *supra*, 655 F.Supp.2d at 1044 ("This establishes that, according to LGE's own theory of

3   infringement, the parts substantially embody the patents, and LGE cannot claim otherwise." )

4   Accordingly, the doctrine of patent exhaustion bars Round Rock's claims for infringement of the

5   '053 and the '791 patents.

6        The '345 patent presents a different situation.  While SanDisk has presented some arguments

7   that the asserted claims are substantially embodied by the Toshiba chips, it has not met its burden to

8   establish that claims related to the functionality of the controllers are barred with respect to this

9   patent. Indeed, its moving papers merely incorporate by reference the arguments it previously made

10   in opposition to Round Rock's motion seeking summary judgment that the exhaustion defense fails

11   as a matter of law.  As those arguments were directed to showing that "a trier of fact could easily

12   conclude" the Toshiba chips gave rise to exhaustion, they fall short of establishing a right to

13   summary judgment in SanDisk's favor.[6]

14

15                             V.  CONCLUSION

16        SanDisk's motion for summary judgment as to the applicability of patent exhaustion is

17   granted with respect to the '053 and the '791 patents, and denied as to the '345 patent.  Round

18   Rock's counter motion on the subject is denied.  Further orders will issue on the motions that remain

19   pending.

20

21   IT IS SO ORDERED.

22

23   Dated: 6/13/14

24                               RICHARD SEEBORG
                            UNITED STATES DISTRICT JUDGE

25

26   _____
[6] On reply, SanDisk contends Round Rock's present position is inconsistent with that taken in

27   certain other litigation. SanDisk's passing mention of that alleged inconsistency is insufficient to
establish an estoppel or that Round Rock has made a binding admission.

28

I hereby certify that the annexed
instrument is a true and correct copy
of the original on file in my office.

ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California

by: Gina Agustine
Deputy Clerk
Date: July 25, 2014

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAN DISK CORPORATION, | No. C 11-5243 RS |
| Plaintiff, | |
| v. | **ORDER RE ADDITIONAL MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO STRIKE** |
| ROUND ROCK RESEARCH LLC | |
| Defendant. | |
| _____/ | |

## I.  INTRODUCTION

By separate orders issued this date, the applicability of patent exhaustion to three of the patents in suit have been resolved, and SanDisk's motions for summary judgment of invalidity and non-infringement of the fourth patent in suit have been denied.   This order resolves the remaining pending motions for partial summary judgment, and the motions each side has brought to strike portions of the opposing expert opinions.

United States District Court

For the Northern District of California

II. DISCUSSION[1]

A. '345 patent

As explained in a prior order, although SanDisk has established the applicability of patent exhaustion with respect to patent claims embodied in memory chips it purchased from Toshiba, it has not established as a matter of law that all of Round Rock's infringement claims under the '345 patent necessarily are foreclosed. Accordingly, the parties' respective motions regarding infringement of certain claims of the patent remain of potential consequence.

Round Rock seeks summary judgment that SanDisk's accused products[2] infringe claim 39. SanDisk offers no opposition, *other* than its contention that the patent is exhausted. While the motion to establish exhaustion of the '345 patent as a matter of law has been denied, the flip side— i.e., that there is *no* exhaustion—does not automatically follow. Accordingly it would be premature to grant partial summary judgment that infringement exists. That said, in the event SanDisk fails to establish exhaustion at trial, a finding of infringement will be warranted.

SanDisk, in turn, seeks summary judgment that Round Rock has no evidence to support a finding of infringement of claim 1. While the motion was pending, however, Round Rock filed notice "that it no longer intends to pursue its claims of infringement for claim 1." SanDisk objects that such notice is insufficient to moot the summary judgment motion, because there has been no dismissal with prejudice, or covenant not to sue. SanDisk points out that it sought a declaration of non-infringement when it, as a plaintiff, filed the original complaint in this action.

SanDisk's motion rests on the argument that Round Rock cannot carry its burden of proving its affirmative infringement claims, in light of its expert's failure to identify structure in the SanDisk

---

[1]  The factual background and the legal standards for summary judgment have been set out in prior orders and will not be repeated here.

[2]  The parties have a dispute as to the scope of the SanDisk products that are properly part of the case. While the parties have addressed that dispute in connection with the motion for summary judgment, there is no dispute that the infringement analysis is the same with respect to *all* of the products Round Rock seeks to include. Accordingly, the question of which products are implicated by this action will be addressed in the context of SanDisk's motion to strike.

1  products that is, or is equivalent to, the structure identified in the claim construction for this means-

2  plus-function claim. While that argument would be sufficient to defeat Round Rock's affirmative

3  claims, it does not address SanDisk's burden on its request for a declaration of non-infringement.

4  Nevertheless, Round Rock may not avoid a binding resolution of the issue by merely asserting it no

5  longer intends to pursue its affirmative infringement claim. Because Round Rock offered no

6  evidence of infringing structure in the accused products other than bare speculation that such

7  structure likely exists, San Disk's motion will be granted as to claim 1.

9      B. '791 Patent

10      As set forth in the prior order, exhaustion applies to the '791 patent, and the infringement

11  claims therefore fail. SanDisk, however, also seeks partial summary judgment that claim 14 of the

12  patent is invalid, as anticipated. Because the consequences of exhaustion and invalidity are not

13  identical, this motion remains potentially consequential.

14      San Disk contends U.S. Patent No. 6,324,602 issued to Chen ("the Chen reference") is prior

15  art that fully anticipates claim 14. The parties are in agreement that the '791 patent, and Claim 14,

16  describe an invention that allows a double-data rate ("DDR") interface to be used with flash

17  memories. The issue is whether the Chen reference discloses the same thing.

18      The specification of the Chen reference expressly refers to a "memory device" that "can be

19  any suitable integrated circuit (IC) memory device *including . . .flash memory*." The specification

20  also discusses the possibility of using the memory device with a DDR interface. Round Rock offers

21  an expert opinion that person having ordinary skill in the art at the time the '791 patent was filed

22  nevertheless would not understand Chen to disclose a double data rate flash memory, as such a

23  person would not have believed that type of interface to be "suitable" for flash memory.

24      SanDisk responds that the expert's bare assertions are insufficient to overcome the clear

25  teaching of the specification. On the present record, SanDisk has not adequately shown that the

26  Chen reference necessarily discloses flash memory used in conjunction with a DDR interface.

27  Plainly it contemplates that the "memory device" can be flash memory, in some applications. It also

28

United States District Court

For the Northern District of California

1    contemplates, however, applications that do not use flash memory.  Thus, while it also suggests the

2    option of using a DDR interface, it does not automatically follow that the DDR option is feasible

3    when the memory device is flash memory.  The testimony of Round Rock's expert that a person

4    reasonably skilled in the art would have considered the two options mutually exclusive is sufficient

5    to create a material dispute.  Accordingly, the motion seeking a finding of invalidity as a matter of

6    law is denied.

7

8        C. '053 Patent

9        Round Rock sought summary judgment that the so-called "Garner" reference is not

10   invalidating prior art to claim 24 of the '053 patent.  In response, San Disk agreed.  Accordingly,

11   whether characterized as a moot issue or as stipulated in Round Rock's favor, the Garner reference

12   is not a basis to find claim 24 invalid.  In light of the finding of exhaustion, any other disputes as to

13   infringement need not be addressed.

14

15       D.   Implied License

16       Finally, Round Rock seeks summary judgment that SanDisk's affirmative defense of an

17   implied license fails as a matter of law.  That motion is granted.  SanDisk's sales to overseas

18   licensees of Round Rock are not relevant because Round Rock does not allege SanDisk contributes

19   to the infringement of, or induces infringement by, any of those entities.  SanDisk also cannot rely

20   on supposed "have made" rights of other third parties, because it has come forward with no

21   evidence that it was specifically commissioned to design and make the products at issue. *See, e.g.,*

22   *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 890 F. Supp. 2d 602, 608–09 (W.D. Pa. 2012)

23   ("Where a licensee commissions the work, a third party's acts do not infringe. When there is no

24   agreement between the licensee and the third party, the third party's acts do infringe." (internal

25   citations omitted)).

26

27

28

4

**ADD13**

   E.  SanDisk's motion to strike

   SanDisk moves to strike portions of Round Rock's expert reports that 1) identify accused products purportedly not identified in Round Rock's infringement contentions, and 2) describe indirect infringement theories allegedly not sufficiently set out in its infringement contentions on that topic.  Round Rock contends striking expert reports is an inappropriate remedy, and that if SanDisk believed the infringement contentions were inadequate, it should have moved to compel amended contentions during discovery.

   While that argument has some force with respect to the indirect infringement theories, it fails with respect to the identification of accused products.  Until the expert reports were served that identified product lines SanDisk had not understood to be part of the case, SanDisk had no reason to know of any inadequacies in Round Rock's infringement contentions.  Accordingly, the first issue is whether or not the infringement contentions identified all of the products Round Rock's experts now list as accused.

   With respect to the '345 patent, Round Rock's infringement contentions,  (1) accused "SanDisk products that comply with the mDOC H3 datasheet . . . "; (2) identified several specific stock keeping units ("SKUs"), all associated with the mDOC product line, as examples of products that comply with the mDOC H3 datasheet; and, (3) included a single claim chart mapping the asserted claims for the mDOC H3 datasheet.  As a result, SanDisk argues that the portions of Round Rock's expert reports concerning products *other* than the mDOC line should be stricken, specifically references to "SD," "microSD," and "iNand" products.

   Round Rock insists that both its answer and its infringement contentions included references to "microSD memory cards," and that it can include SD and iNand products because they are products that "comply with the mDOC H3 datasheet."  In the context of ruling on a discovery dispute, however, the assigned magistrate judge recently rejected the same basic arguments. While that ruling is not strictly binding here, it was correct.  Notwithstanding the passing references to "microSD" Round Rock expressly limited its infringement contention to products involving mDOC

5

Case: 11-cv-05243-RS Document 136 Filed 08/04/2014

1   H3 datasheet revisions 1.2 and 1.3.  Accordingly, the motion to strike is granted with respect to SD,

2   microSD, and iNand products.[3]

3       The motion to strike is denied with respect to the expert's alleged descriptions of "new"

4   indirect infringement theories.  SanDisk has not established that the additional detail provided by the

5   experts was improper or prejudicial, particularly in light of its failure to move to compel at any prior

6   juncture.

7

8       F.  Round Rock's motion to strike

9       Round Rock seeks to strike the portions of SanDisk's expert report that rely on alleged prior

10  art references known as Lee and Nguyen.  SanDisk's opposition disavows any reliance on those

11  references, and asserts it would have done so if asked even before the motion was filed.  This prong

12  of the motion is therefore moot.[4]

13      Round Rock also seeks to strike portions of SanDisk's expert reports discussing non-

14  infringing alternatives.  That prong of the motion is denied.  Round Rock has not shown any such

15  information was improperly withheld during fact discovery.

16      Finally, the portion of Round Rock's motion seeking to strike material based on late-

17  produced spreadsheets is also denied.  The parties' meet and confer discussions regarding further

18  deposition testimony, however, shall include this topic.

19

20

21

-----

22  [3] In light of the finding on exhaustion, the portion of SanDisk's motion to strike related to the '053 patent is moot.

23

24  [4] On reply, Round Rock objects to a "supplemental report" SanDisk served after expert depositions were complete, and after the motion to strike had been filed.  While Round Rock's apparent effort to

25  avoid expanding the number of pending motions is appreciated, a reply brief is an inadequate vehicle for presenting what effectively is a new motion to strike. Accordingly, the objection to the

26  supplemental report is overruled, without prejudice.  The parties shall meet and confer forthwith to arrange for such further deposition time that Round Rock may reasonably require in light of the

27  supplemental report.  If thereafter warranted, Round Rock may renew its objection prior to trial.

28

United States District Court
For the Northern District of California

**ADD15**

### III.  CONCLUSION

The remaining motions for partial summary judgment, and the two motions to strike are granted to the extent expressly stated above, and are otherwise denied.  An order addressing all of the sealing requests made in connection with these motions will issue upon the parties' submission of their revised proposals.

IT IS SO ORDERED.

Dated: 6/13/14

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7

**ADD16**

1  BLACK & HAMILL LLP
   Bradford J. Black (SBN 252031)
2  bblack@blackhamill.com
   Andrew G. Hamill (SBN 251156)
3  ahamill@blackhamill.com
   4 Embarcadero Center, Suite 1400
4  San Francisco, California 94111
   Telephone:  415-813-6210
5  Facsimile:  415-813-6222

6  DESMARAIS LLP
   Jon T. Hohenthaner (admitted *pro hac vice*)
7  jhohenthaner@desmaraisllp.com
   John C. Spaccarotella (admitted *pro hac vice*)
8  jspaccarotella@desmaraisllp.com
   Tamir Packin (admitted *pro hac vice*)
9  tpackin@desmaraisllp.com
   Richard M. Cowell (admitted *pro hac vice*)
10 rcowell@desmaraisllp.com
   Ameet A. Modi (admitted *pro hac vice*)
11 amodi@desmaraisllp.com
   230 Park Avenue
12 New York, NY 10169
   Telephone: 212-351-3400
13 Facsimile:  212-351-3401

KEKER & VAN NEST LLP
Robert A. Van Nest (SBN 84065)
rvannest@kvn.com
Christa M. Anderson (SBN 184325)
canderson@kvn.com
Leo L. Lam (SBN 181861)
llam@kvn.com
Ryan K. Wong (SBN 267189)
rwong@kvn.com
633 Battery Street
San Francisco, CA  94111-1809
Tel: (415) 391-5400 / Fax:  (415) 397-7188

VINSON & ELKINS LLP
Christopher V. Ryan (*pro hac vice*)
cryan@velaw.com
Efren Garcia (*pro hac vice*)
egarcia@velaw.com
Seth Linder (*pro hac vice*)
slindner@velaw.com
Janice L. Ta (*pro hac vice*)
jta@velaw.com
2801 Via Fortuna, Suite 100
Austin, TX  78746
Tel: (512) 542-8400 / Fax: (512) 542-8612

14 *Attorneys for Defendant and Counterclaim*   *Attorneys for Plaintiff and Counterclaim*
   *Plaintiff ROUND ROCK RESEARCH LLC*       *Defendant SANDISK CORPORATION*

15

16

17 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**

18

19 SANDISK CORPORATION,                     Case No. 3:11-cv-05243-RS

20         Plaintiff and                    **STIPULATION AND [~~PROPOSED~~]**
           Counterclaim                     **ORDER DISMISSING CERTAIN**
21         Defendant,                       **CLAIMS AND ENTERING FINAL**
                                            **JUDGMENT**
22    v.

23 ROUND ROCK RESEARCH LLC,

24         Defendant and
           Counterclaim Plaintiff.

25

26      By Orders dated June 13, 2014, the Court granted SanDisk's motion for summary judgment

27 of exhaustion on all of Round Rock's infringement claims relating to U.S. Patent Nos. 6,570,791 and

28 6,845,053 (Dkt. No. 358), and granted SanDisk's motion to strike its SD, microSD, and iNand

products from this case with respect to U.S. Patent No. 5,682,345 (Dkt. No. 360), among other things. In light of the Court's Orders, the only infringement allegations remaining in this case are: (i) the alleged infringement of U.S. Patent No. 6,383,839 in connection with SanDisk's microSD Memory Cards; and (ii) the alleged infringement of U.S. Patent No. 5,682,345 in connection with SanDisk's mDOC products.

In view of the limited potential recovery relating to the remaining infringement claims compared to the expense of proceeding with trial on these claims, Round Rock hereby covenants not to assert infringement claims against SanDisk or its customers for infringement of U.S. Patent No. 6,383,839 ("the '839 patent") based upon the past or future manufacture, use, sale, offer for sale, or importation of the SanDisk products currently at issue in this action with respect to the '839 patent, *i.e.*, the accused SanDisk microSD Memory Cards. Round Rock further covenants not to assert infringement claims against SanDisk or its customers for infringement of U.S. Patent No. 5,682,345 ("the '345 patent") based upon the past or future manufacture, use, sale, offer for sale, or importation of the SanDisk products currently at issue in this action with respect to the '345 patent, *i.e.*, the accused SanDisk mDOC products. The remaining claims in this action that were not resolved by the Court on summary judgment are therefore moot.

Accordingly, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), SanDisk Corporation ("SanDisk") and Round Rock Research LLP ("Round Rock") hereby stipulate to dismiss the following causes of action in connection with the remaining pending claims in this action. SanDisk stipulates to dismiss its second cause of action (Declaratory Judgment of Invalidity of U.S. Patent No. 6,383,839) and its fourth cause of action (Declaratory Judgment of Non-Infringement of U.S. Patent No. 5,682,345) without prejudice, and Round Rock stipulates to dismiss the second count of its counterclaims (Infringement of U.S. Patent No. 5,682,345) and the seventh count of its counterclaims (Infringement of U.S. Patent No. 6,383,839) with prejudice.

No further issues remain for trial. The parties therefore respectfully request that the Court enter final judgment pursuant to its June 13, 2014, Order (Dkt. No. 358) in favor of SanDisk on its sixth cause of action (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,570,791) and twelfth cause of action (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,845,053),

1  and against Round Rock on Count VIII of it counterclaims (Infringement of U.S. Patent No.

2  6,570,791) and Count XII of its counterclaims (Infringement of U.S. Patent No. 6,845,053). Each

3  party shall bear its own costs and attorneys' fees.

4

5  Dated: July 3, 2014                                        Respectfully submitted,

6  By: /s/ Bradford J. Black                              By: /s/ Leo L. Lam
   Bradford J. Black                                      Leo L. Lam
7  BLACK & HAMILL LLP                                     KEKER & VAN NEST LLP
   Bradford J. Black (SBN 252031)                         Robert A. Van Nest (SBN 84065)
8  bblack@blackhamill.com                                 rvannest@kvn.com
   Andrew G. Hamill (SBN 251156)                          Christa M. Anderson (SBN 184325)
9  ahamill@blackhamill.com                                canderson@kvn.com
   4 Embarcadero Center, Suite 1400                       Leo L. Lam (SBN 181861)
10 San Francisco, California 94111                        llam@kvn.com
   Telephone: 415-813-6210                                Ryan K. Wong (SBN 267189)
11 Facsimile:  415-813-6222                               rwong@kvn.com
                                                          633 Battery Street
12 DESMARAIS LLP                                          San Francisco, CA  94111-1809
   Jon T. Hohenthaner (admitted *pro hac vice*)           Tel: (415) 391-5400 / Fax:  (415) 397-7188
13 jhohenthaner@desmaraisllp.com
   John C. Spaccarotella (admitted *pro hac vice*)        VINSON & ELKINS LLP
14 jspaccarotella@desmaraisllp.com                        Christopher V. Ryan (*pro hac vice*)
   Tamir Packin (admitted *pro hac vice*)                 cryan@velaw.com
15 tpackin@desmaraisllp.com                               Efren Garcia (*pro hac vice*)
   Richard M. Cowell (admitted *pro hac vice*)            egarcia@velaw.com
16 rcowell@desmaraisllp.com                               Seth Linder (*pro hac vice*)
   Ameet A. Modi (admitted *pro hac vice*)                slindner@velaw.com
17 amodi@desmaraisllp.com                                 Janice L. Ta (*pro hac vice*)
   230 Park Avenue                                        jta@velaw.com
18 New York, NY 10169                                     2801 Via Fortuna, Suite 100
   Telephone: 212-351-3400                                Austin, TX  78746
19 Facsimile:  212-351-3401                               Tel: (512) 542-8400 / Fax: (512) 542-8612

20 *Attorneys for Defendant and Counterclaim*             *Attorneys for Plaintiff and Counterclaim*
   *Plaintiff ROUND ROCK RESEARCH LLC*                    *Defendant SANDISK CORPORATION*

21

22                              **Civil L.R. 5-1(i)**

23       I, Bradford J. Black, hereby attest that Leo L. Lam has concurred in the filing of this

24  document.

25                                         By:  /s/ Bradford J. Black
                                                Bradford J. Black
26

27

28

**ADD19**

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on July 3, 2014, the foregoing document was filed with the Clerk of the U. S. District Court for the Northern District of California, using the court's electronic case filing system (ECF), in compliance with Civil L.R. 5-1.  The ECF sends a Notice of Electronic Filing (NEF) to all parties and counsel who have appeared in this action and who have consented under Civil L.R. 5-1 to accept that NEF as service of this document.

/s/ Bradford J. Black
Bradford J. Black

1
## [~~PROPOSED~~] ORDER

2      Pursuant to the above stipulation, the following causes of action in connection with the

3 remaining pending claims in this action are hereby dismissed. SanDisk's second cause of action

4 (Declaratory Judgment of Invalidity of U.S. Patent No. 6,383,839) and its fourth cause of action

5 (Declaratory Judgment of Non-Infringement of U.S. Patent No. 5,682,345) are hereby dismissed

6 *without prejudice*, and Round Rock's second count of its counterclaims (Infringement of U.S. Patent

7 No. 5,682,345) and seventh count of its counterclaims (Infringement of U.S. Patent No. 6,383,839)

8 are hereby dismissed *with prejudice*.

9      Further, for the reasons set forth in the Court's June 13, 2014, Order (Dkt. No. 358), the

10 Clerk is directed to enter judgment pursuant to Fed. R. Civ. P. 58 in favor of SanDisk Corporation on

11 its sixth cause of action (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,570,791)

12 and twelfth cause of action (Declaratory Judgment of Non-Infringement of U.S. Patent No.

13 6,845,053), and against Round Rock on Count VIII of it counterclaims (Infringement of U.S. Patent

14 No. 6,570,791) and Count XII of its counterclaims (Infringement of U.S. Patent No. 6,845,053). This

15 Order resolves all remaining issues between the parties, and each party shall bear its own costs and

16 attorneys' fees.

17

18      **IT IS SO ORDERED.**

19

20 Dated: 7/3/14 _____          _____
                                            Honorable Richard Seeborg

21                                            United States District Judge

22

23

24

25

26

27

28

**ADD21**

I hereby certify that the annexed
instrument is a true and correct copy
of the original on file in my office.

ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California

by: Gina Agustine
Deputy Clerk
Date: July 25, 2014

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SANDISK CORPORATION, | No. C 11-5243 RS |
| Plaintiff, | |
| v. | **JUDGMENT** |
| ROUND ROCK RESEARCH LLC | |
| Defendant. | |
| _____/ | |

Pursuant to the stipulation of the parties filed this date, and the Order filed June 13, 2014,
(Dkt. No. 358), judgment is hereby entered in favor of SanDisk on its sixth cause of action
(Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,570,791) and twelfth cause of
action (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,845,053), and against
Round Rock on Count VIII of it counterclaims (Infringement of U.S. Patent No. 6,570,791) and
Count XII of its counterclaims (Infringement of U.S. Patent No. 6,845,053).  Each party shall bear
its own costs and attorney fees.

IT IS SO ORDERED.

Dated: 7/3/14

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE



US006570791B2

(12) **United States Patent**
Roohparvar et al.

(10) **Patent No.:**     **US 6,570,791 B2**
(45) **Date of Patent:**          **May 27, 2003**

(54) **FLASH MEMORY WITH DDRAM INTERFACE**

(75) Inventors: **Frankie Fariborz Roohparvar**, Milpitas, CA (US); **Kevin C. Widmer**, San Carlos, CA (US)

(73) Assignee: **Micron Technology, Inc.**, Boise, ID (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/943,330**

(22) Filed: **Aug. 30, 2001**

(65) **Prior Publication Data**

US 2003/0043624 A1 Mar. 6, 2003

(51) Int. Cl.$^7$ ............................................... **G11C 16/04**
(52) U.S. Cl. .............. **365/185.33**; 365/233; 365/189.05
(58) **Field of Search** ............................. 365/185.33, 233, 365/189.05, 230.06, 230.08, 230.09, 185.08; 711/162

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,903,496 A  *  5/1999  Kendall et al. ......... 365/185.12

| | | | |
|---|---|---|---|
| 6,043,694 A | 3/2000 | Dortu | |
| 6,100,733 A | 8/2000 | Dortu et al. | |
| 6,130,853 A | 10/2000 | Wang et al. | |
| 6,134,180 A | * 10/2000 | Kim et al. | .............. 365/230.02 |
| 6,154,419 A | 11/2000 | Shakkarwar | |
| 6,166,970 A | 12/2000 | Yun | |
| 6,201,760 B1 | 3/2001 | Yun et al. | |
| 6,215,710 B1 | 4/2001 | Han et al. | |
| 6,215,722 B1 | 4/2001 | Park | |
| 6,215,726 B1 | * 4/2001 | Kubo | .......................... 327/141 |
| 6,233,199 B1 | 5/2001 | Ryan | |
| 6,310,814 B1 | 10/2001 | Hampel et al. | |
| 6,327,216 B1 | 12/2001 | Ryan | |
| 6,336,174 B1 | * 1/2002 | Li et al. | ..................... 365/228 |
| 6,343,046 B1 | * 1/2002 | Matsui | ...................... 365/190 |

* cited by examiner

*Primary Examiner*—David Lam
(74) *Attorney, Agent, or Firm*—Leffert Jay & Polglaze, P.A.

(57) **ABSTRACT**

A flash memory has an interface corresponding to a DDR DRAM. The memory samples commands and addresses on a rising edge of a clock signal. The read and write data are provided on both the rising edge and the falling edge of the clock signal.

**17 Claims, 5 Drawing Sheets**





*fig. 1*



*Fig. 2*



*Fig. 3*



*Fig. 4*



*Fig. 5*



*Fig. 6*



*Fig. 7*

US 6,570,791 B2

1

# FLASH MEMORY WITH DDRAM INTERFACE

## FIELD OF THE INVENTION

The present invention relates generally to memory devices and in particular the present invention relates to a non-volatile memory interface.

## BACKGROUND OF THE INVENTION

A typical Flash memory comprises a memory array that includes a large number of memory cells arranged in row and column fashion. Each of the memory cells includes a floating gate field-effect transistor capable of holding a charge. The cells are usually grouped into blocks. Each of the cells within a block can be electrically programmed in a random basis by charging the floating gate. The charge can be removed from the floating gate by a block erase operation. The data in a cell is determined by the presence or absence of the charge in the floating gate.

A synchronous DRAM (SDRAM) is a type of DRAM that can run at much higher clock speeds than conventional DRAM memory. SDRAM synchronizes itself with a CPU's bus. SDRAM's can be accessed quickly, but are volatile. Many computer systems are designed to operate using SDRAM, but would benefit from non-volatile memory.

Advances in DRAM interfaces has resulted in double data rate (DDR) DRAMs. These memory devices provide data communication that is synchronized to both rising and falling edges of a clock signal. While DDR DRAMs provide for fast data communications, the data is stored in a volatile manner.

For the reasons stated above, and for other reasons stated below which will become apparent to those skilled in the art upon reading and understanding the present specification, there is a need in the art for a non-volatile memory that can communicate at fast DRAM speeds.

## SUMMARY OF THE INVENTION

The above-mentioned problems with non-volatile memories and other problems are addressed by the present invention and will be understood by reading and studying the following specification.

In one embodiment, a flash memory comprises an array of non-volatile memory cells, data connections, and output circuitry to provide output data on the data connections on rising and falling edges of a clock signal.

In another embodiment, a flash memory comprises an array of non-volatile memory cells, data connections, a clock signal connection to receive a clock signal, and output circuitry to provide output data on the data connections on rising and falling edges of the clock signal. Input circuitry is provided to receive input data on the data connections on rising and falling edges of the clock signal.

A method of reading a flash memory comprises providing a read command, providing memory cell addresses, reading first and second data words from non-volatile memory cells, outputting the first data word on a rising edge of a clock signal, and outputting the second data word on the falling edge of the clock signal.

Another method of reading a flash memory comprises reading first and second data words from non-volatile memory cells, outputting the first data word on a rising edge of a clock signal, and outputting the second data word on the falling edge of the clock signal.

2

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an embodiment of a flash DDR memory of the present invention;

FIG. 2 illustrates one interconnect configuration of the memory of FIG. 1;

FIG. 3 is a timing diagram of a read operation of the memory of FIG. 1;

FIG. 4 is a timing diagram of another read operation of the memory of FIG. 1;

FIG. 5 is a timing diagram of another read operation of the memory of FIG. 1;

FIG. 6 is a timing diagram of a write operation of the memory of FIG. 1; and

FIG. 7 is a block diagram of another embodiment of the present invention.

## DETAILED DESCRIPTION OF THE DRAWINGS

In the following detailed description of the preferred embodiments, reference is made to the accompanying drawings, which form a part hereof, and in which is shown by way of illustration specific preferred embodiments in which the inventions may be practiced. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention, and it is to be understood that other embodiments may be utilized and that logical, mechanical and electrical changes may be made without departing from the spirit and scope of the present invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the claims.

The present invention provides a non-volatile memory device that is compatible with double data rate dynamic random access memory (DDR DRAM). DDR DRAMs generally provide output data that is synchronized to both transitions of a clock signal.

Referring to FIG. 1, a block diagram of a flash memory according to one embodiment of the present invention is described. The memory device includes an array of non-volatile floating gate memory cells. As known to those in the art, the non-volatile memory cells store a charge on the floating gate. The floating gate charge changes the threshold voltage of the memory cell. In traditional flash memory cells, a current-sensing scheme was employed to read the memory cells. The present invention uses a voltage-sensing scheme to read the non-volatile memory cells. Possible voltage-sensing schemes are described in U.S. patent applications "Differential Sensing in a Memory Using Two Cycle Pre-Charge" Ser. No. 09/648,706, filed Aug. 25, 2000; "Bit Line Pre-Charge in a Memory" Ser. No. 09/648,701, filed Aug. 25, 2000; "Adjustable Pre-Charge in a Memory" Ser. No. 09/648,722, filed Aug. 25, 2000; and "Differential Sensing in a Memory" Ser. No. 09/648,723, filed Aug. 25, 2000, each incorporated herein by reference.

The DDR flash memory of the present invention can be arranged in numerous different architectures, and FIG. 1 is merely a representative architecture of the present invention. Memory device 100 includes an array of non-volatile flash memory cells 102. The array is arranged in a plurality of addressable banks. In one embodiment, the memory contains four memory banks 104, 106, 108 and 110. Each memory bank contains addressable sectors of memory cells. The data stored in the memory can be accessed using externally provided location addresses received by address register 112. The addresses are decoded using row address multiplexer circuitry 114. The addresses are also decoded

US 6,570,791 B2

3

using bank control logic 116 and row address latch and decode circuitry 118. To access an appropriate column of the memory, column address counter and latch circuitry 120 couples the received addresses to column decode circuitry 122. Circuit 124 provides input/output gating, data mask logic, read data latch circuitry and write driver circuitry. Circuit 124 also includes precharge circuitry used to read the non-volatile memory cells, as explained below.

Data is input through data input registers 126 and output through data output registers 128. Command execution logic 130 is provided to control the basic operations of the memory device. A state machine 132 is also provided to control specific operations performed on the memory arrays and cells. A status register 134 and an identification register 136 can also be provided to output data. The command circuit 130 and/or state machine 132 can be generally referred to as control circuitry to control read, write, erase and other memory operations. The illustrated memory architecture uses a common read and write path. Other embodiments can include separate the read and write paths to provide for the power requirements of writing to the flash cells.

FIG. 2 illustrates an interconnect pin assignment of one embodiment of the present invention. The memory package 150 has an interconnect configuration that is substantially similar to available DDR DRAM packages. Two optional interconnects can be provided in an embodiment of the present invention; RP# 152 and Vccp 154. Although the present invention shares interconnect labels that are appear the same as DDR DRAM's, the function of the signals provided on the interconnects are described herein and should not be equated to DDR DRAM's unless set forth herein.

The CK and Ck# inputs are differential clock signals, and all address and control signals are sampled on the crossing of the positive edge of CK and negative edge of CK#. Output data is references at the crossing of CK and CK#. A clock enable, CKE, input is provided, and a chip select, CS#, enables a command decoder circuit. RAS#, CAS# and WE# signals are used to input commands. Data mask inputs, DM0–DM3, can be used to perform masking operations on memory data. Bank address inputs, BA0–BA1, and address inputs, A0–A10, identify memory array locations. The number of bank address inputs and address inputs is selected based on the size of the array, and the present invention is not limited to the address inputs described. Data input/output connections, DQ, are provided for bi-directional data communication. A DQ strobe connection can be provided which provides a signal that is edge aligned with read data and center aligned with write data. Various power supply connections are also provided. The VCC connection provides a power supply such as 3V. A ground connection is provided through the Vss connection. Another optional voltage is provided on the VCCP connection 154. The VCCP connection can be tied externally to VCC, and sources current during device initialization, write and erase operations. That is, writing or erasing to the memory device can be performed with a VCC voltage. The flash memory can include an RP# connection to place the device in a deep power-down mode when LOW, and is held HIGH during all other modes of operation.

The present invention uses an initialization operation to load volatile latches used during memory operation. The volatile latches are loaded using data read from non-volatile memory cells, or registers. The non-volatile memory cells, or registers, can be distributed around the memory device, or consolidated in a small array.

4

The flash memory provides a DDR interface that processes two data words per clock cycle. Read accesses to the memory can be burst oriented. That is, memory accesses start at a selected location and continue for a programmed number of locations in a programmed sequence. Read accesses begin with the registration of an ACTIVE command, followed by a READ command. The address bits registered coincident with the ACTIVE command are used to select the bank and row to be accessed. The address bits registered coincident with the READ command are used to select the starting column location and bank for the burst access.

An ACTIVE command is used to open (or activate) a row in a particular array bank for a subsequent access. The value on the BA0, BA1 inputs selects the bank, and the address provided on inputs A0–A10 selects the row. The READ command is used to initiate a burst read access to an active row. The value on the BA0, BA1 inputs select the bank, and the address provided on inputs A0–A7 selects the starting column location.

A WRITE command is used to initiate a single-location write access on an active row. A WRITE command is preceded by a WRITE SETUP command. The value on the BA0, BA1 inputs select the bank, and the address provided on inputs A0–A7 selects a column location. Input data appearing on the DQs is written to the memory array, subject to the DQM input logic level appearing coincident with the data.

Before any READ or WRITE commands can be issued to a bank within the DDR flash memory, a row in that bank is "opened." This is accomplished via the ACTIVE command (defined by CS#, WE#, RAS#, CAS#), which selects both the bank and the row to be activated. A single-location WRITE is initiated with a WRITE command. The starting column and bank addresses are provided with the WRITE command.

Referring to FIG. 3, a timing diagram of a read operation is described. The current invention provides read data timing that corresponds with existing DDR DRAM specifications. After a row has been accessed using an active command (not shown), a READ command is issued at time T0. Following a clock latency (2 in this example), the read data is output on the DQ lines. The output data is provided on each transition of the clock signal. That is, four words of the illustrated burst are output in two clock cycles.

Referring to FIG. 4, a timing diagram of consecutive read operations is described. The first read operation is performed as explained above. A second READ command is provided at time T2 with a new column start address. Following a clock latency (2 in this example), the first read data is output on the DQ lines. At time T4, the second read burst is provided on the DQ connections.

Referring to FIG. 5, a timing diagram of consecutive read operations is described. The first read operation is initiated as explained above. On clock cycles T1, T2 and T3, additional READ commands are issued to the memory. Following a twocycle clock latency, the first read data is output on the DQ lines. The output data burst is interrupted after one clock cycle to provide data from the next read operation. As such, two words are output from each accessed column.

A timing diagram of a write operation is illustrated in FIG. 6. The present invention uses non-volatile memory cells, as explained above, for data storage. The process used to write data to the array, therefore, requires more time than writing to dynamic memory cells. The present invention allows data to be written to the memory using a DDR timing, as

US 6,570,791 B2

5

illustrated. That is, two words are provided on the DQ during each clock cycle. The memory stores the data in a volatile buffer until the data is written to the array. It will be appreciated that limits on the volume of write data may be required to insure that all received data is written to the array.

The present invention uses a data-sensing scheme that increases the speed of read operations and reduces current consumption compared to conventional flash memory devices. That is, conventional flash memories use a current sensing technique that compares a current conducted by a memory cell to a reference current. This sensing technique is slower than a DRAM differential voltage-sensing scheme. Further, to read numerous columns of memory cells simultaneously, conventional current sensing techniques consume a relatively large current.

An embodiment of the present invention uses a voltage sensing technique to read the non-volatile memory cells. In one embodiment, differential digit lines are precharged to different voltage levels prior to accessing a memory cell. For example, an active digit line that is coupled to a read memory cell can be pre-charged to a voltage that is greater than a complementary digit line. If the read memory cell is unprogrammed (conducts current when read), the active digit line is quickly discharged below the complementary digit line voltage. If the read memory cell is programmed (does not conduct current when read), the active digit line voltage remains above the complementary digit line voltage. A differential voltage sensing circuit can be used to detect and amplify the digit line voltages. Further, pre-charging the digit lines to a differential level is not limited to a specific technique, but can be accomplished using charge sharing, a bias circuit or the like.

The present invention allows both volatile and non-volatile memory devices to use a unified communication bus as shown in FIG. 7. As such, a separate non-volatile bus is eliminated. Both non-volatile **170** and volatile **172** memories use the volatile memory bus **174**, which is in turn coupled to a processor **176**. Further, both memories **170** and **172** respond to common command signals, although the command signals may be interpreted differently by the memories **170** and **172**.

CONCLUSION

A flash memory has been described that has an interface corresponding to a DDR DRAM. The memory samples commands and addresses on a rising edge of a clock signal. The read and write data are provided on both the rising edge and the falling edge of the clock signal.

Although specific embodiments have been illustrated and described herein, it will be appreciated by those of ordinary skill in the art that any arrangement, which is calculated to achieve the same purpose, may be substituted for the specific embodiment shown. This application is intended to cover any adaptations or variations of the present invention. Therefore, it is manifestly intended that this invention be limited only by the claims and the equivalents thereof.

What is claimed is:

**1**. A flash memory comprising:

an array of non-volatile memory cells;

sense amplifier circuitry coupled to the array, wherein the sense amplifier circuitry detects a differential voltage from the array of non-volatile memory cells;

data connections; and

output circuitry to provide output data on the data connections on rising and falling edges of a clock signal.

**2**. The flash memory of claim **1** wherein the flash memory comprises an interconnect configuration that is compatible

6

with a double data rate dynamic random access memory (DDR DRAM).

**3**. The flash memory of claim **1** further comprising input circuitry to receive input data on the data connection on rising and falling edges of a clock signal.

**4**. A flash memory comprising:

an array of non-volatile memory cells;

sense amplifier circuitry coupled to the array, wherein the sense amplifier circuitry detects a differential voltage from the array of non-volatile memory cells;

data connections;

a clock signal connection to receive a clock signal;

output circuitry to provide output data on the data connections on rising and falling edges of the clock signal; and

input circuitry to receive input data on the data connections on rising and falling edges of the clock signal.

**5**. The flash memory of claim **4** wherein the flash memory comprises an interconnect configuration that is compatible with a double data rate synchronous dynamic random access memory (DDR SDRAM).

**6**. A flash memory comprising:

an array of non-volatile memory cells, wherein the array comprises bit lines couplable to the non-volatile memory cells;

sense amplifier circuitry coupled to the bit lines, wherein the sense amplifier circuitry detects a differential voltage between the bit lines;

pre-charge circuitry coupled to pre-charge the bit lines to first and second voltage levels to provide an initial differential voltage prior to sensing a memory cell;

data connections;

a clock signal connection to receive a clock signal; and

output circuitry to provide output data on the data connection on rising and falling edges of the clock signal.

**7**. The flash memory of claim **6** further comprising input circuitry to receive input data on the data connection on rising and falling edges of the clock signal.

**8**. A flash memory comprising:

an interconnect configuration that is compatible with a double data rate synchronous dynamic random access memory (DDR SDRAM);

an array of non-volatile memory cells;

data connections;

a clock signal connection to receive a clock signal;

control circuitry coupled to the array to provide two data access operations per clock cycle; and

control signals comprising a data strobe signal (DQS) connection, address signal connections, row address strobe (RAS) connection, column address strobe (CAS) connection, write enable (WE) connection, and a chip select (CS) connection.

**9**. A method of reading a flash memory comprising:

providing a read command;

providing memory cell addresses;

reading first and second data words from non-volatile memory cells;

outputting the first data word on a rising edge of a clock signal; and

outputting the second data word on the falling edge of the clock signal.

**10**. The method of claim **9** wherein the flash memory comprises an interconnect configuration that is compatible with a double data rate synchronous dynamic random access memory (DDR SDRAM).

US 6,570,791 B2

7

**11**. The method of claim **9** wherein reading the first and second data words from the non-volatile memory cells comprises detecting a program state of the non-volatile memory cells using a voltage comparator circuit.

**12**. The method of claim **11** wherein the non-volatile memory cells are floating gate memory cells and the comparator circuit detects a voltage of a word line coupled to non-volatile memory cells.

**13**. A method of reading a flash memory comprising:

detecting a first and a second differential voltage from non-volatile memory cells with sense amplifier circuitry;

reading first and second data words from the non-volatile memory cells in response to the first and second differential voltages;

outputting the first data word on a rising edge of a clock signal; and

outputting the second data word on the falling edge of the clock signal.

**14**. A processing system comprising:

a processor; and

a double data rate flash memory coupled to the processor comprising:
   an array of non-volatile memory cells;

8

a clock signal connection to receive a clock signal; and
control circuitry coupled to the array to provide two data access operations per clock cycle.

**15**. The processing system of claim **14** wherein the flash memory comprises an interconnect configuration that is compatible with a double data rate synchronous dynamic random access memory (DDR SDRAM).

**16**. A processing system comprising:

a processor;

a single communication bus coupled to the processor;

a volatile memory device coupled to the single communication bus; and

a double data rate flash memory coupled to the single communication bus comprising,
   an array of non-volatile memory cells,
   a clock signal connection to receive a clock signal, and
   control circuitry coupled to the array to provide two data access operations per clock cycle.

**17**. The processing system of claim **16** wherein the volatile memory device and the double data rate flash memory both respond to common command signals provided on the single communication bus.

\* \* \* \* \*



US006845053B2

(12) **United States Patent**
Chevallier

(10) Patent No.: **US 6,845,053 B2**
(45) Date of Patent: **Jan. 18, 2005**

(54) **POWER THROUGHPUT ADJUSTMENT IN FLASH MEMORY**

(75) Inventor: **Christophe J. Chevallier**, Palo Alto, CA (US)

(73) Assignee: **Micron Technology, Inc.**, Boise, ID (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 59 days.

(21) Appl. No.: **10/295,653**

(22) Filed: **Nov. 15, 2002**

(65) **Prior Publication Data**

US 2004/0095834 A1 May 20, 2004

(51) **Int. Cl.**[7] ................................................ **G11C 7/00**
(52) **U.S. Cl.** ............. **365/226**; 365/189.01; 365/189.04; 365/189.12
(58) **Field of Search** ........................... 365/226, 189.01, 365/189.04, 189.12

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,507,760 | A | * | 3/1985 | Fraser ........................ 365/221 |
| 5,537,354 | A | | 7/1996 | Mochizuki et al. |
| 6,067,598 | A | | 5/2000 | Roohparvar et al. |
| 6,469,932 | B2 | * | 10/2002 | Roohparvar et al. ... 365/185.09 |
| 6,657,900 | B2 | * | 12/2003 | Roohparvar ........... 365/185.33 |

* cited by examiner

*Primary Examiner*—Richard Elms
*Assistant Examiner*—Pho M. Luu
(74) *Attorney, Agent, or Firm*—Leffert Jay & Polglaze, P.A.

(57) **ABSTRACT**

A mode control bit is used to adjust a mode of a memory device. The mode control bit is stored in a non-volatile memory location and selects between a data rate, low power consumption mode and a higher power, fast programming mode. In the low power consumption mode the mode control bit reduces the rate at which data bits are programmed into the memory device.

**29 Claims, 5 Drawing Sheets**





𝓕𝒾𝑔. 1



Fig. 2



*Fig. 3*

ADD36



*Fig. 4*



*Fig. 5*

US 6,845,053 B2

1

# POWER THROUGHPUT ADJUSTMENT IN FLASH MEMORY

## BACKGROUND OF THE INVENTION

### I. Field of the Invention

The present invention relates generally to programming flash memory and particularly to throughput adjustment.

### II. Description of the Related Art

Flash memory devices have developed into a popular source of non-volatile memory for a wide range of electronic applications. Flash memory devices typically use a one-transistor memory cell that allows for high memory densities, high reliability, and low power consumption. Common uses for flash memory include portable computers, personal digital assistants (PDAs), digital cameras, and cellular telephones. Program code, system data such as a basic input/output system (BIOS), and other firmware can typically be stored in flash memory devices.

To encompass a large variety of applications, chip designers make some restrictive choices in the characteristics of the memory design. These characteristics include current consumption and programming speed or throughput. The designers typically have to trade off one for the other since the faster the programming, the higher the current consumption. Similarly, the larger the number of bits programmed in parallel, the higher the current consumption.

Battery powered devices would benefit more from low power consumption than higher throughput. Line powered devices would benefit more from programming throughput than low power consumption. In order to satisfy both markets, flash memory designers typically have to design multiple versions of a memory. This requires more time and money on the part of the designer. There is a resulting need in the art for a way to choose power consumption versus throughput in a flash memory device.

## SUMMARY

The embodiments of the present invention encompass a memory device that has a plurality of modes including a high data throughput mode and a low power mode. The device is comprised of a non-volatile memory location that stores a mode control bit. The state of the mode control bit selects one of the modes. In one embodiment, the mode control bit controls the rate at which data is programmed into the memory device's memory array, thereby controlling the power consumption.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows block diagram of one embodiment for a flash memory device incorporating the programmable modes of the present invention.

FIG. **2** shows a logic diagram of one embodiment of the mode control programmable element of the present invention.

FIG. **3** shows a continuation of the logic diagram of the embodiment of FIG. **2**.

FIG. **4** shows a timing diagram in accordance with the embodiment of FIGS. **2** and **3**.

FIG. **5** shows flowchart of one embodiment of a power and throughput adjustment method of the present invention.

## DETAILED DESCRIPTION

The embodiments of the present invention provide a memory device manufacturer with the ability to design one

2

flash memory device that has a selectable low current consumption (i.e., low power) mode and a high data throughput mode. The mode is selectable by a latch that is programmed to select one of the modes. In one embodiment, this latch is permanently programmed with the desired mode at the time of manufacture.

While the subsequent discussion of the embodiments of the present invention refers to flash memory, any type of memory device that has similar characteristics may be used. For example non-volatile RAM (NOVRAM) or electrically erasable programmable read only memory (EEPROM) may be used.

FIG. **1** is a functional block diagram of a memory device (**100**) of one embodiment of the present invention that is coupled to a processor (**110**). The memory device (**100**) and the processor (**110**) may form part of an electronic system (**120**). The processor (**110**) performs the operational tasks of the electronic system including generating address and control signals for the memory device (**100**). The memory device (**100**) has been simplified to focus on features of the memory that are helpful in understanding the present invention.

The memory device includes an array of memory cells (**130**). The memory cells are non-volatile floating-gate memory cells and the memory array (**130**) is arranged in banks of rows and columns.

An address buffer circuit (**140**) is provided to latch address signals provided on address input connections A0-Ax (**142**). Address signals are received and decoded by a row decoder (**144**) and a column decoder (**146**) to access the memory array (**130**). It will be appreciated by those skilled in the art, with the benefit of the present description, that the number of address input connections depends on the density and architecture of the memory array (**130**). That is, the number of addresses increases with both increased memory cell counts and increased bank and block counts.

The memory device (**100**) reads data in the memory array (**130**) by sensing voltage or current changes in the memory array columns using sense/latch circuitry (**150**). The sense/latch circuitry, in one embodiment, is coupled to read and latch a row of data from the memory array (**130**). Data input and output buffer circuitry (**160**) is included for bi-directional data communication over a plurality of data (DQ) connections (**162**) with the processor (**110**). Write circuitry (**155**) is provided to write data to the memory array (**130**).

The write circuitry (**155**) may be comprised of any circuitry required to write data to the memory array. FIGS. **2** and **3** illustrate an example of write circuitry that is discussed subsequently in greater detail.

Command control circuit (**170**) decodes signals provided on control connections (**172**) from the processor (**110**). These signals are used to control the operations on the memory array (**130**), including data read, data write, and erase operations.

An array of control registers (**180**) store control functions of the present invention. Some of the control registers are used for typical control functions and others are reserved for expansion and/or future use. In one embodiment, at least one address or latch within the control registers (**180**) is comprised of a fuse element that is substantially similar to the memory technology used in programmable read only memories (PROMs) and known to those skilled in the art. This latch is programmed with the mode control bit of the present invention. This bit is referred to as TP BIT in subsequent figures.

US 6,845,053 B2

**3**

In one embodiment, the mode control bit is programmed to a logical 0 to instruct the memory device to enter a low power mode. A logical 1 programs the device to a high throughput mode. Alternate embodiments use the opposite logic to invoke these modes. Still other embodiments use more than one bit in order to select from more than two different memory device modes.

Once the appropriate register or latch has been programmed with the desired state of the mode control bit, it is permanently programmed. Alternate embodiments of the mode control bit program the bit into a register or latch that can be cleared later and reprogrammed. This permits the mode of the memory device to be changed later.

The flash memory device illustrated in FIG. 1 has been simplified to facilitate a basic understanding of the features of the memory. A more detailed understanding of internal circuitry and functions of flash memories are known to those skilled in the art.

One embodiment of an implementation of the mode control programmable element of the present invention is illustrated in FIGS. 2 and 3. This embodiment varies the quantity of bits being programmed in order to vary the current consumption of the memory device. In a high throughput, higher power mode, the maximum quantity of bits is programmed at once. This mode has an increased current consumption due to programming a large number of bits simultaneously. In the lower power, low throughput mode, a reduced quantity of bits is programmed at once. In this mode, the programming rate is slowed down. This reduces the current consumption of the memory device. Alternate embodiments use other methods to adjust the current consumption/data throughput in response to the mode control bit.

The embodiment of FIG. 2 is comprised of two flip-flops (**201** and **203**) that generate four clocking signals. In one embodiment, the flip-flops (**201** and **203**) are D-type flip-flops. Other embodiments use other types of flip-flops.

The first flip-flop (**201**) is coupled to an originating clock signal. This clock signal can be generated from a circuit that is separate from the flash memory or the clock circuit may be incorporated into the flash memory circuitry. In one embodiment, the clock signal has a frequency of 5 MHz. This frequency is for illustration purposes only and does not limit the present invention to any one frequency.

The $\overline{Q}_0$ output of the first flip-flop (**201**) is fed back to its data input. The first flip-flop (**201**) generates a clock signal that is half the frequency of the originating clock signal. The $Q_0$ output of the first flip-flop (**201**) is input to the CLK input of the second flip-flop (**203**).

The $\overline{Q}_0$ output of the second flip-flop (**203**) is fed back to its data input. The second flip-flop (**203**) generates a clock signal that is one quarter of the frequency of the originating clock signal. The second flip flop then outputs a $Q_1$ signal and a $\overline{Q}_1$ signal.

The $Q_0$, $\overline{Q}_0$, $Q_1$, and $\overline{Q}_1$ signals of the flip-flop circuit are input to a logical AND/OR circuit to generate four data select signals (DATASEL0-DATASEL3). The DATASEL3 signal is generated by performing a logical AND operation (**205** and **210**) on the $Q_0$ and $Q_1$ signals. The output of this operation is then logically ORed (**215** and **220**) with the TP BIT to generate the DATASEL3 signal.

The $\overline{Q}_0$ and $Q_1$ signals are logically ANDed (**206** and **211**) and the output of the AND (**206** and **211**) operation is logically ORed (**216** and **221**) with TP BIT to generate the DATASEL2 signal. The $Q_0$ and $\overline{Q}_1$ signals are logically ANDed (**207** and **212**) and the output of the AND operation

**4**

(**207** and **212**) is logically ORed (**217** and **222**) to generate the DATASEL1 signal. The DATASEL0 signal is generated by the logical ANDing (**208** and **213**) of the $\overline{Q}_0$ and $\overline{Q}_1$ signals with the subsequent OR operation (**218** and **223**) of the output of the AND (**208** and **213**) operation.

The circuit of FIG. 2 shows that when the mode control bit is set to a logical high state to select the high data throughput mode, the data select signals (DATASEL0-DATASEL3) are always high. When the mode control bit (TP BIT) is set to a logical low state to select the low power mode, the data select signals (DATASEL0-DATASEL3) are high whenever the preceding AND operation is true. The timing diagram of this operation is illustrated in FIG. 4 and discussed subsequently.

FIG. 3 illustrates a logic diagram of a circuit that uses the data select signals (DATASEL0-DATASEL3) of FIG. 2. Depending on the state of the TP BIT, each data selection signal (DATASEL0-DATASEL3) selects a different 16-bit block of data to be loaded into a data driver (**380**).

The input data from a processor or other device is input to data latches (**301**). In the embodiment of FIG. 3, there are 64 data latches (**301**). Other embodiments use a different quantity of latches.

Each of the data select signals (DATASEL0-DATASEL 3) are input to a logical AND operation (**305-320**) for its assigned 16-bit data block. For example, DATASEL0 selects DATA0-DATA15, DATASEL1 selects DATA16-DATA31, DATASEL2 selects DATA32-DATA47, and DATASEL3 selects DATA48-63. For purposes of clarity, only the first and last logical AND operations (**305-320**) of each 16-bit data block are shown. It is obvious to those skilled in the art that there are an additional fourteen AND operations between these two AND operations (**305-320**).

When a 16-bit data block's respective data select signal is at a logical high, the data of that block from the data latches (**301**) is written to the data drivers (**380**). The data from the other 48 latches in the data drivers (**380**) will be 0 (the result of the logical AND operation of the data bit and the data select signal at 0). In a typical flash memory architecture, where a logic "0" is a programmed bit, the negative output of the data latch will be used. Therefore, a logic 0 in the data latch will give a physical "1" for the data driver signal if the related data select signal is high. A physical "1" in the data driver will bring the flash memory bit line high and the flash array cell will be programmed. Unselected data drivers will all be at 0 and no data will be programmed from unselected drivers.

As discussed subsequently with respect to FIG. 4, in the low power mode, each of the data select signals is only high for one clock cycle. During this clock cycle, the programming sequence for that data will be executed. Typically, a Write State Machine inside the control block (**170**) of FIG. 1, which controls all internal operations, will control the clock cycle. In the high data throughput mode, the data select signals are always high so that all 64 data bits are written simultaneously.

The data drivers (**380**) are included in write circuitry block (**155**). The output of the data drivers goes to the memory array as illustrated in FIG. 1. In the low power mode, each time 16-bits are asserted in the data drivers (**380**), a programming operation is executed resulting in the 16 bits being programmed into the memory array. In the high data throughput mode, each time the 64 bits are asserted in the data drivers (**380**), the programming operation is executed resulting in all 64 bits being programmed substantially simultaneously. The programming operation is known by those skilled in the art and is not discussed further.

US 6,845,053 B2

| 5 | 6 |

The embodiment of FIGS. **2** and **3** is for illustration purposes only. Other embodiments may use different sizes of data blocks or a different total quantity of bits to be programmed, depending on the application. Still other embodiments use different methods for varying the current use by the memory device. For example, setting the mode control bit to a low power mode may increase the time between programming pulses such that data throughput is reduced.

FIG. **4** illustrates a timing diagram for the embodiment of FIGS. **2** and **3**. As discussed previously with respect to FIG. **2**, the originating clock signal (**401**) generates the $Q_0$ (**402**), $\overline{Q}_0$ (**403**), $Q_1$ (**404**), and $\overline{Q}_1$ (**405**) signals. The mode control signal (TP BIT) is shown as being at a logical low to select the low power mode.

The data select signals (**407–410**) are each high for one originating clock period. They are also high in a successive fashion so that only one data select signal (**407–410**) is high at any one time. In this way, each 16-bit data block of FIG. **3** is programmed separately from the other data blocks.

FIG. **5** illustrates a flowchart of one embodiment of a power and data throughput adjustment method of the present invention. The mode is selected (**501**) based on the application for the memory device. If the device is to be used in a battery-power device, low power operation would be desirable. If the device is to be used in a line power application, high data throughput may be chosen since current consumption is not typically a concern.

The selected mode is programmed into the mode control latch (**502**). If the low power mode was selected (**505**), data is programmed at a lower rate (**510**) so that less current is consumed during the programming operation. The lower rate is less than the maximum programming rate that would occur if all of the data latches were used substantially simultaneously. As described above, this may be in blocks of 16 bits or some other data block size. For example, two data select signals could be high simultaneously by using only $Q_0$ and $\overline{Q}_0$ outputs in the data select signal's generation.

If the high data throughput mode was selected (**505**), data is programmed at a higher data throughput (**515**). This rate is the maximum programming rate using all of the data latches.

In summary, a non-volatile memory bit is used to adjust the data throughput and, therefore, the power consumption of a memory device. A single memory device can be designed that can be used in either high-speed applications or low power applications by setting the mode control bit.

In one embodiment, the mode control bit selects a low power mode. This mode slows down the programming rate of the memory device, thus reducing the current requirements. In another embodiment, the mode control bit selects a high throughput mode. This mode programs the maximum quantity of bits substantially simultaneously. This mode requires a greater current draw than the low power mode with the reduced programming rate.

Numerous modifications and variations of the present invention are possible in light of the above teachings. It is therefore to be understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described herein.

What is claimed is:

1. A memory device having an adjustable current consumption, the memory device comprising:
   a memory array for storing data input to the memory device during a low power mode; and
   a data register that stores a mode control bit, the adjustable current consumption being set to the low power mode in response to a state of the mode control bit.

2. The memory device of claim **1** wherein the data register is a non volatile memory register.

3. The memory device of claim **1** wherein the memory array is a flash memory array.

4. The memory device of claim **1** wherein the state of the mode control bit controls a rate of programming data into the memory array.

5. The memory device of claim **4** and further including write circuitry coupled to the memory array that controls the rate of programming data into the memory array in response to the state of the mode control bit.

6. The memory device of claim **1** wherein the low power mode has a reduced programming rate as compared to a high power mode.

7. A memory device having an adjustable data throughput, the memory device comprising:
   a memory array for storing data input to the memory device; and
   a data register that stores a mode control bit, the adjustable data throughput being set in response to a state of the mode control bit.

8. The memory device of claim **7** and further including write circuitry coupled to the memory array that controls the rate of programming data into the memory array in response to the state of the mode control bit.

9. The memory device of claim **8** wherein the write circuitry comprises:
   a plurality of data latches that latch data input to the memory device; and
   a plurality of data drivers coupled to the plurality of data latches such that a data bit from a first data latch is coupled to a first data driver when enabled by a data select signal generated in response to the mode control bit.

10. A memory device having a high data throughput mode and a low power mode, the memory device comprising:
   a memory array for storing data input to the memory device; and
   a non-volatile memory location that stores a mode control bit, one of the high data throughput mode or the low power mode being selected in response to a state of the mode control bit.

11. The memory device of claim **10** wherein the non-volatile memory location is a fuse element.

12. A flash memory device having a high data throughput mode and a low power mode, the flash memory device comprising:
   a memory array for storing data input to the flash memory device;
   a non-volatile memory location that stores a mode control bit, one of the high data throughput mode or the low power mode being selected in response to a state of the mode control bit; and
   write circuitry that couples the input data to the memory array, the write circuitry varying a quantity of data being programmed to the memory array in a predetermined time in response to the selected mode.

13. The flash memory device of claim **12** wherein the write circuitry programs blocks of data to the memory array, each block of data having a predetermined size.

14. The flash memory device of claim **13** wherein a different block of data is programmed during each clock cycle of a clock coupled to the memory device.

15. A method for programming a memory device comprising:
   selecting a power mode of operation, from a plurality of different power modes of operation, based on an application for the memory device; and

US 6,845,053 B2

7

programming a latch in the memory device with an indication of the selected power mode of operation.

**16**. The method of claim **15** wherein the plurality of power modes of operation include a low power mode and a higher power, high data throughput mode.

**17**. The method of claim **15** wherein the programming comprises programming a fuse element with the indication of the mode of operation.

**18**. A method of operation of a memory device comprising:

determining a mode of operation of the memory device, the mode of operation being programmed into a non-volatile latch of the memory device; and

adjusting a data programming rate of the memory device in response to the mode of operation.

**19**. A method of operation of a memory device comprising:

determining a mode of operation of the memory device, the mode of operation being programmed into a non-volatile latch of the memory device;

if the mode of operation is for a low power consumption, programming data into the memory device at a first predetermined data rate that is less than a maximum data rate allowable by the memory device; and

if the mode of operation is for high data throughput, programming data into the memory device at a second predetermined data rate that is greater than the first predetermined data rate.

**20**. An electronic system comprising:

a processor that performs operational tasks of the electronic system; and

a memory device, coupled to the processor, having a plurality of modes, the memory device comprising:

a memory array for storing data input to the memory device; and

a non-volatile memory location that stores a mode control bit, one of the plurality of modes being selected in response to a state of the mode control bit.

**21**. The electronic system of claim **20** wherein the processor is responsible for inputting data to the memory device.

**22**. The electronic system of claim **20** wherein the processor is responsible for programming data into the memory device.

8

**23**. The electronic system of claim **20** wherein the memory device is a flash memory.

**24**. An electronic system comprising:

a processor that performs operational tasks of the electronic system; and

a flash memory device having a high data throughput mode and a low power mode, the flash memory device comprising:

a memory array for storing data input to the flash memory device;

a non-volatile memory location that stores a mode control bit, one of the high data throughput mode or the low power mode being selected in response to a state of the mode control bit; and

write circuitry that couples the input data to the memory array, the write circuitry varying a quantity of data being programmed to the memory array in a predetermined time in response to the selected mode.

**25**. The electronic system of claim **24** wherein the write circuitry comprises circuitry to program, in response to the selected mode, either blocks of data each having a predetermined quantity of bits or all programmable data bits.

**26**. The electronic system of claim **25** wherein, in the low power mode, the predetermined quantity of bits of each block of data is less than a maximum quantity of bits programmable into the memory device substantially simultaneously.

**27**. A memory device having an adjustable data throughput, the memory device comprising:

a memory array for storing data input to the memory device; and

a data register that stores a mode control bit, a rate of programming the memory array being controlled in response to a state of the mode control bit.

**28**. The memory device of claim **27** wherein the rate of programming is a low programming rate in response to the state of the mode control bit.

**29**. The memory device of claim **27** wherein the rate of programming is a high programming rate in response to the state of the mode control bit.

*   *   *   *   *

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Oct 3, 2014 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Jon T. Hohenthaner |                | /s/ Jon T. Hohenthaner |
Name of Counsel                                      Signature of Counsel

Law Firm | Desmarais LLP |

Address | 230 Park Avenue |

City, State, ZIP | New York, New York 10169 |

Telephone Number | 212-351-3400 |

FAX Number | 212-351-3401 |

E-mail Address | jhohenthaner@desmaraisllp.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒   The brief contains 7,933 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐   The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒   The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

☐   The brief has been prepared in a monospaced typeface using _____ in a _____ characters per inch _____ font.

Dated: October 3, 2014          /s/ Jon T. Hohenthaner
                                _____
                                Jon T. Hohenthaner

                                *Counsel for Defendant-Appellant*
                                *Round Rock Research LLC*